IN THE MATTER OF ANDREW O. WITTREICH, AN ATTORNEY AND COUNSELLOR AT LAW.

Argued November 7, 1949, February 20, 1950 and May 29, 1950— Decided June 19, 1950.

For the rule: *Mr. Horace K. Roberson,* Prosecutor of the Pleas, Hudson County, and *Mr. Simon L. Fisch,* Deputy Attorney General of New Jersey (*amici curiæ*).

*Contra: Mr. George W. C. McCarter.*

Respondent suspended for two years and until further order of the court.

VANDERBILT, C. J. (dissenting). On July 28, 1949, the respondent, Andrew O. Wittreich, was ordered to answer charges of professional misconduct. The majority of the Court are of the opinion that he should be suspended from the practice of law for two years and until the further order of the Court. This means, in effect, suspension for two years, unless the respondent is guilty meantime of further misconduct.

The imposition of discipline on offending members of the bar is one of the unpleasant duties of our Court, but its performance is essential to public respect for and confidence in the legal profession. It is particularly distasteful to me that the first dissenting opinion that I have filed in the two years I have been on the bench should be on this point, but in my judgment the sentence imposed by the majority is entirely inadequate in view of the proven facts and out of line with the decisions of this Court in previous disciplinary proceedings. The matter is one of such importance to the profession and, indeed, the public that I feel that I should set forth the facts developed at the hearings and the reasons why I think the respondent should be disbarred.

A hearing held on August 2, 3 and 4, 1949, brought to light facts adverse to the respondent. On June 23, 1949, Jack Lalogian, an illiterate Armenian, 72 years of age and partially incapacitated by paralysis, came to the respondent's law office in Jersey City for the purpose of retaining the respondent to represent him in administering the estate of his brother, Sam Lalogian, who had died intestate three days previous on June 20, 1949. The respondent learned that the estate consisted of the decedent's interest in a checking account in the joint names of the two brothers in the First National Bank of Jersey City, containing a balance of approximately $33,000,

his interest in a Jersey City apartment house owned jointly by the brothers and whatever might be contained in a safe deposit box in the name of the decedent. At this conference the respondent suggested to Jack Lalogian that $25,000 be withdrawn from the joint account and held by the respondent so that the inheritance tax supervisor could not "tie the whole account up. So let us get the money out and argue about it afterward." When his office associate, a recently admitted attorney, questioned the propriety of this procedure, the respondent remarked, "I will fix it up, don't worry."

Accordingly, the respondent wrote out a check payable to himself as attorney for the sum of $25,000, antedated it to June 20, 1949, the date of Sam Lalogian's death, and had Jack Lalogian sign it. The following morning the respondent sent his office associate to the First National Bank of Jersey City and had the check certified. The respondent then took the check personally to the First National Bank and Trust Company of Paterson, where with the cooperation of the assistant cashier, a personal friend of the respondent, with whom he had earlier made arrangements by telephone, he attempted to open an account as attorney and deposit the check. The regular account officer, however, objected to the opening of an attorney's account and the account was therefore opened in the respondent's name personally, despite the fact that it was drawn to his order as attorney and the bank was thus put on notice that it was not his personal funds. This suited the respondent perfectly; he testified that "the account was to be a general account anyway," though how he could believe such an untruth in the light of the facts passes comprehension. Why the bank, moreover, should have refused to open an attorney's account is impossible to fathom, for every well advised lawyer who values either his reputation or his license to practice law has two bank accounts, one an attorney's account for funds that are not his, and the other a personal account for moneys that are exclusively his own, but this phase of the matter is no more fantastic than many others which were to follow.

But five days later, on June 29, 1949, the respondent drew a check on the Paterson account in the sum of $3,000 in part payment of the purchase price of a new Cadillac sedan. The balance of the purchase price was covered by trading in a 1948 Pontiac car which the respondent then owned, but which had been purchased on time and on which he still owed $256.63. The respondent testified that he purchased this new car for the purpose of making a favorable impression on the Negroes with whom he was then negotiating a contract for the development of a beach resort in Florida. To quote him, "to a Negro specially, the psychology of having a big car means you are somebody—not me personally, but my idea was to use that car in the work of Bethune Beach." This venture was, of course, entirely alien to the Lalogian estate which had no use for a Cadillac car. On July 7th, he drew another check for $1,000 to the order of the Hudson Trust Company, which was deposited in his personal account there to cover checks drawn on this account the succeeding day in payment of trust funds payable to other clients, and without which his personal account would have been overdrawn and the outstanding checks bad for insufficient funds. On July 13th, he drew two checks on the Paterson account, one for $125 in part payment of two signs and the other for $350 for architect's fees, both in connection with the Florida real estate venture in which he was deeply interested. On July 19th, the respondent drew two more checks, one for $3,000 as a loan to a friend to enable him to redeem certain property he had pledged with a pawn shop, and the other for $500 to another friend in repayment of a loan. The last check drawn on the Paterson account, was made payable to "cash" for $50 and was negotiated by the respondent through his barber. This check was dishonored on presentation due to a temporary restraint that had been imposed upon the account by the court.

In the meantime Jack Lalogian and his cousins in Philadelphia had consulted with a lawyer there, who raised some doubts in their minds concerning the regularity of the respondent's action in securing the $25,000 check payable to

himself as attorney. In any event, Jack Lalogian, his relatives, and the Philadelphia lawyer visited the respondent on July 5th in Jersey City and questioned him with respect to the propriety of his action and the whereabouts of the $25,000. The respondent informed them that "it was for administrative purposes and he wanted to have the money set aside for purposes of the taxes, inheritance taxes, because if it wasn't in the bank, there would not be that much money to tax." The Philadelphia lawyer testified that he then demanded that the respondent return the money within 48 hours, and told the respondent to notify him when it had been redeposited. The degree of the respondent's recklessness is indicated by the fact that all of the checks on the Paterson account except the one for the Cadillac sedan were drawn *after* this demand for the repayment of the $25,000.

Not having heard from the respondent for a week, the Philadelphia lawyer on July 12th consulted with a Camden law firm and within the next few days an associate of this firm went to Jersey City to get information with respect to the transaction, but without success. Subsequently on July 25th, a partner in the Camden firm, in company with Lalogian and a relative of the latter, went to Jersey City and found out that the $25,000 had been deposited by the respondent in a Paterson bank and that only $17,000 remained on deposit there. Immediately a verified complaint was prepared with the assistance of counsel for the First National Bank of Jersey City, which believed itself vulnerable, since the account required the signatures of both brothers for withdrawals. The papers were presented to the court that night and appropriate *ad interim* restraint was obtained. By July 27th the respondent made arrangements for restitution, and a consent order of dismissal was entered. Restitution was made in the form of a $25,000 certified check drawn on the respondent's account in the Paterson bank, the respondent having deposited $8,000 in cash in that account on July 27th in order that there be sufficient funds therein to enable the bank to certify a check for $25,000.

As to the source of this $8,000, the respondent testified that it was part of a $9,000 fee that had been available to him for several weeks, that it was paid to him by Dr. Dante P. Crisonino in a very delicate private matter, that most of the services for which it was paid had been completed, that there would be an additional fee when the matter was entirely completed, and that the services rendered by the respondent with respect thereto started on May 17, 1949. He further testified that he had previously received payment of $5,000 on account of his fee from Dr. Crisonino and that at all times while there was less than $25,000 in the Paterson account he had available at least $8,000 to make up the deficit, all of which was later demonstrated to be utterly untrue.

At a second hearing held on December 20 and 21, 1949, inquiry was made into the facts and circumstances surrounding the respondent's obtaining of the $8,000 which he had used to make good the moneys withdrawn from the Lalogian funds in the Paterson bank. At this hearing it developed that the $5,000 and $9,000 payments received by the respondent from Dr. Crisonino, instead of being fees, were advances made to the respondent by Dr. Crisonino for the purpose of and contingent upon his obtaining of leases on certain parking lots owned by the City of Jersey City, and that these advances were secured by the respondent's promissory notes. When these leases were not forthcoming (the respondent contends that he was "double-crossed" by certain city officials), Dr. Crisonino in September, 1949, retained counsel for the purpose of causing the respondent either to produce the leases, or, failing that, to return the $14,000 paid him by way of advances. It being impossible for the respondent to obtain the leases from the City, and the advances having been already used by the respondent to make good the shortage in the Paterson account and for other personal purposes, the respondent called upon his good friend, the Mayor of Jersey City, to help him make good his obligation to Dr. Crisonino. Subsequently on October 8, 1949, the Mayor of Jersey City caused $14,000 in cash to be delivered to Dr. Crisonino's counsel.

The respondent insisted that he recognized no liability to the Mayor on account of this payment, because of legal services he had rendered, but he declined to place any value on these services.

A third hearing was held on April 17 and 21, 1950, for the purpose of inquiry into the facts and circumstances surrounding an $8,000 certified check of one "William," which the respondent at the earlier hearing had testified he had "available" at the time of the shortage in the Paterson account. At this hearing, at which significantly the respondent did not elect to testify, it developed that this $8,000 certified check represented a loan made to the respondent by William Ciccone, also known as Williams, secured by the respondent's promissory note payable three months from date and by the assignment to Ciccone of the respondent's Cadillac automobile, which, as we have seen, had been purchased largely with funds belonging to the Lalogian estate. This loan had been negotiated for the respondent through a labor leader who had been a client. The evidence produced at this hearing is in marked contrast to that of the respondent at the previous hearings, where it was asserted that this check was received as a fee in payment of legal services rendered, and with respect to which the respondent had testified that "I didn't go and ask anybody to borrow it at that time," and in whose brief it was referred to as "the sum of $8,000 paid by the union men," and that he had at his disposal "money the union men had given him." That the $8,000 was in truth a loan, and not a fee, is demonstrated by the fact that the respondent has since paid Ciccone $3,500 on account.

From the facts adduced at the hearings the respondent is guilty beyond any doubt: (1) of a violation of Canon No. 11 of the Canons of Professional Ethics which, by virtue of *Rule* 1:7-6 govern the conduct of the members of the bar of this State. These canons are set forth in Volume II of the Rules Governing the Courts of the State of New Jersey, commencing at page 139. Canon No. 11 provides as follows:

"The lawyer should refrain from any action whereby for his personal benefit or gain he abuses or takes advantage of the confidence reposed in him by his client.

"Money of the client or collected for the client or other trust property coming into the possession of the lawyer should be reported and accounted for promptly, and should not under any circumstances be commingled with his own or be used by him."

(2) of a violation of *R. S.* 2:124–11 which reads:

"Any consignee, factor, bailee, agent or servant, intrusted with the care or sale of any personal property, or intrusted with the collection or care of any moneys, who shall fraudulently take or convert the same, or the proceeds of the sale of the same, or any part thereof, to his own use or to the use of any other person whatsoever, except the rightful owner thereof, shall be guilty of a misdemeanor."

(3) of that duty of trust imposed by law upon every person who stands in a fiduciary relationship to another.

The respondent admits that his conduct in commingling and utilizing the funds of his clients was in direct violation of Canon No. 11, but he attempts to excuse his actions by saying that, while he acted like a "jackass * * * with a cock-eyed conception of things," he was ignorant of the provisions of this canon and, therefore, not aware that his actions were wrongful. In fact he testified that it had always been his practice to commingle the funds of his clients with his personal moneys. It is difficult to conceive that an attorney who has been an active trial lawyer for 25 years, and as such necessarily handled clients' funds and who had been an assistant prosecutor of the pleas for five years, where cases such as this in their criminal aspects are not infrequent, is not. as he rightfully is expected to be, familiar with the Canons of Professional Ethics regulating his conduct as an attorney as well as with the criminal law, and the first duty of any fiduciary. The Canons of Professional Ethics which should govern his everyday conduct had been accepted for many years in this State as the standards regulating the conduct of the bar long before their incorporation in the Rules of Court.

The respondent likewise pleads ignorance of probate practice to explain his conduct in having the $25,000 withdrawn

from the Lalogians' account so that the Inheritance Tax Supervisor could not "tie the whole account up" and this despite the fact that it was shown at the hearing that he had personally handled several estate matters. The defense of ignorance of the law is not to be favorably considered by this Court, especially when the person raising it is presumed to be an expert in the law. It likewise cannot be overlooked that the respondent was warned by his young office associate that "you can't do that." But most impressive of all is the fact that the respondent drew most of the checks on the Paterson account after a demand had been made for the return of the $25,000 within 48 hours. In a disciplinary proceeding in which the defense was raised that the attorneys were not familiar with the law with relation to the administration of an oath, the court said: "This excuse is too attenuated for serious consideration. * * * The defense of these young men, it will be seen, is confession and avoidance; the avoidance, however, not constituting a defense. These respondents were taught, and may remember, that it is a well settled and fundamental principle that ignorance of the law excuses no man; and yet they urge, and urge only, an alleged ignorance of the law. * * *" *In re Breidt* (*In re Lubetkin*), 84 *N. J. Eq.* 222, 225 (*Ch.* 1915). This Court cannot accept the defense of ignorance in a matter so basic and fundamental as is here involved. But even the spurious defense of ignorance is not available after Lalogian's demand for the return of the $25,000.

The respondent also argues that he is not guilty of embezzlement because he lacked the necessary fraudulent intent. But the presence of this intent is a question of fact to be inferred from his overt acts and the attending circumstances. A man is presumed in law to intend that which he does or which is the immediate and natural consequence of his act, *State v. Then,* 118 *N. J. L.* 31 (*Sup. Ct.* 1937); affirmed, 119 *N. J. L.* 429 (*E. & A.* 1938). The respondent's acts and the surrounding circumstances do not here bespeak an innocent mind. He intended Jack Lalogian, an aged, ill, ignorant

and illiterate foreigner, to sign a check to the respondent's order as attorney for $25,000; he prepared the check for signature and predated it to the date of Sam Lalogian's death; he had it certified at the first opportunity without informing the bank of the death of one of the joint owners of the account on which it was drawn; he immediately deposited it in an out of town bank in an entirely new account opened in his own name individually; within a few days he began to draw upon this account for his own personal purposes, to buy a new expensive automobile, to pay expenses of a private business venture, to make good shortages in funds belonging to other clients which had been deposited in his regular personal account, to make a loan to a needy friend, to pay off a personal obligation, and to provide himself with pocket money—without the knowledge or consent of his client. When the respondent's defalcations were discovered, he made restitution only after suit was brought, and the funds used therefor belonged to another client, who in turn was forced to threaten suit to recover his due. The ancient scheme of robbing Peter to pay Paul was thus repeatedly resorted to by the respondent. These facts are not consistent with an innocent mind, but clearly reveal an intent on the part of the respondent to misuse for his own purpose money belonging to others.

It is also urged upon us that the gravity of the offenses with which the respondent is charged are lessened by the fact restitution was in each case accomplished and that no loss was suffered by the persons involved. While the fact of restitution is a matter to be considered in disciplinary proceedings, it is not of controlling importance. Although restitution relieves the respondent of civil liability, it does not exculpate him from criminal responsibility. 18 *Am. Jur., p.* 585, § 27. In this proceeding, however, we are not primarily concerned with the civil or criminal remedies which may result from the respondent's behavior, but with the moral character which his actions reveal. In the case of *In re Harris,* 88 *N. J. L.* 18, 22 (*Sup. Ct.* 1915), the court said:

"Without underestimating the importance of restitution a moment's reflection must convince one that of all the factors that enter into the question of moral fitness the mere circumstance of restitution is the one most likely to be fortuitous and to depend upon conditions and circumstances that afford no reliable test of moral qualities. The money may have come from wealthy relatives, or from a lucky speculation or from engaging in some alien business venture, or it may have been borrowed, in which case the old liability is apparently extinguished by the creation of a new one. Taken in connection with other circumstances, restitution may be of the utmost significance, but this, oftener than not is due to such other circumstances rather than to the mere fact of nonrestitution."

When the facts surrounding the restitution here accomplished are examined, it becomes apparent that restitution was had under the "honesty of compulsion" and that the very restitution made of the Lalogian funds was by virtue of a fresh conversion of funds belonging to others. The restitution here made is not, therefore, a purgation of the offense, but rather compounds it. Nor does such restitution, based on a new wrong, indicate that the respondent deserves the trust and confidence of the public and is a fit person to remain on the rolls of this Court.

The attitude of the respondent in the instant proceedings is another important factor in determining the seriousness of the offense and the discipline called for. When forced to face the facts of his misappropriation of $8,000 of estate funds by trickery on a client, who peculiarly needed his sound counsel, the respondent took the specious position which he has since consistently maintained, that there was nothing wrong in his abstracting trust funds if he had at all times available ready funds of his own to replace his peculations. This defense is so lacking the slightest shred of merit that it requires no repudiation here. Concerning this vain defense, suffice it to say that not only does it run foul of the Canons of Professional Ethics, the criminal law and the law of trusts, but no rule could be devised that would be more likely to tempt the weak or those in financial difficulties. Having set up a spurious defense, the respondent testified, not once but twice, to sets of facts, first in the Crisonino advances of $5,000 and

$9,000, and then in the Ciccone loan, which were completely refuted not merely by the testimony of the so-called clients, but by the unequivocal and unambiguous acts of the repayment of the so-called fees, the first in full and the second in large part. It is significant that the respondent did not even take the stand to deny the facts of the Ciccone loan of $8,000. In thus brashly seeking to impose on the court, the respondent has increased his previous offenses by violating Canon 22:

"The conduct of the lawyer before the Court and with other lawyers should be characterized by candor and fairness."

and by giving perjured testimony at two different hearings. As the New York court succinctly remarked in the case of *In re Lichtenberg,* 169 *App. Div.* 505, 155 *N. Y. S.* 482, 485 (1915):

"The respondent's extraordinary idea that conversion of trust funds is excused if the converter was or believed he was able, at will, to raise the amount necessary to replace the sums converted, argues as strongly as does the offenses with which he is charged, and of which he has been proven to be guilty, that he is an unfit person to remain a member of a profession in which scrupulous honesty is of prime importance.

The respondent is accordingly disbarred."

The record before us discloses a conscious and deliberate intent to mislead the court; it evidences a complete lack of the high degree of candor and forthrightness that is to be expected of an attorney, especially in a proceeding such as this where the respondent's character is in issue. It demonstrates beyond any possible contradiction the respondent's unfitness to practice law.

The judicial action called for by the respondent's misconduct is inescapable. Almost fifty years ago in the matter of *In re Cahill,* 66 *N. J. L.* 527, 530 (*Sup. Ct.* 1901), the court stated:

"To justify the disbarment of an attorney, one of three things should be established: (1) Conviction of crime, (2) evidence which, in the judgment of the court shows that a crime has been committed

and that the facts proven would justify a conviction thereof; (3) such intentional fraud upon the court or a client that shows evidence of moral turpitude."

While we do not adopt these standards as the present day test for disbarment, for it would be almost unthinkable to suggest that the standards of the bar have not advanced in the last half century, nevertheless by applying even these standards to the facts in the instant case only one conclusion is possible. The respondent herein not only is guilty of the crime of embezzlement, but of perpetrating it after a formal demand for the return of the funds. He has also been guilty of practicing an intentional fraud upon both his clients and the Court. By his reckless conduct in the face of the threat of imminent legal proceedings to recover the funds he has misappropriated he has evidenced a complete lack of that high sense of personal honor and integrity that the public has the right to expect of a member of the bar. I am not unmindful that the consequences of disbarment are severe, but that cannot deter us from the performance of our unmistakable obligations to the public and to the profession. It must be realized by lawyer and layman alike that honesty and integrity are both conditions precedent and conditions subsequent to the practice of law. It must always be borne in mind that the public has its first contact with the law through the lawyers. Only an attorney whose conduct and character is impeccable is a proper person to guide the layman who seeks him out as an advocate and counsellor. The respondent here has not only failed his clients, he has sought to impose on the Court in asserting a spurious defense and in buttressing it by perjurious evidence in two distinct transactions.

I would strike the name of the respondent from the rolls. Mr. Justice Ackerson joins in this dissent.

*To suspend for two years and until further order*—Justices CASE. HEHER, OLIPHANT. WACHENFELD and BURLING—5.

*To disbar*—Chief Justice VANDERBILT, and Justice ACKERSON—2.