IN THE MATTER OF GEORGE J. SHAMY AND JACK PINCUS, ATTORNEYS AT LAW.

Argued September 14, 1971—Decided October 21, 1971.

*Mr. Bruce M. Schragger* for the order to show cause.

*Mr. William T. McElroy* for respondent George J. Shamy.

*Mr. John E. Toolan* for respondent Jack Pincus.

PER CURIAM. In March 1971 the respondents George J. Shamy and his law partner Jack Pincus were ordered to show cause why they should not be suspended from the practice of law pending the determination of disciplinary proceedings grounded on alleged violations by them of the canons of ethics and the rules of court. Thereafter Shamy was suspended effective July 31, 1971 and until further order of this Court, and the matter was referred to Superior Court Judge Gerofsky with plenary power to act as an Ethics Committee. Answers to the charges against them were filed by the respondents, hearings were held during which testimony was duly taken, and a full report containing detailed findings and conclusions was in due course filed by Judge Gerofsky.

The first charge dealt with in the report related to Shamy's use of trust funds in violation of Canon 11. This charge was admitted in Shamy's answer and during the hearings, though Shamy testified that no client was ever "denied, or delayed, or deprived in any way of one dollar." Shamy was a heavy gambler with gambling losses running into hundreds of thousands, and trust funds from his law firm's special account were indiscriminately transferred by him to its general account with later replacement by funds borrowed from banks and others. The shortages in the special account varied from day to day but on occasion were as high as $61,000. In his report Judge Gerofsky explicitly determined that Shamy "did in fact divert" trust funds; that his "addiction to gambling was the proximate cause of such invasion of trust funds"; that despite his invasion of trust funds "no client has yet been deprived of monies owed and due him"; and finally that Shamy "is now cognizant of his weakness" and "has not gambled for a period in excess of a year and a half."

The second charge against Shamy was that he encouraged the violation of the laws of this State by placing bets with bookmakers in violation of Canon 32. Though most of Shamy's gambling activities took place at legal race tracks within the State he admittedly placed some bets with bookmakers. He of course knew that violations of New Jersey law were involved and indeed he used a fictitious name. The report set forth that "while respondent Shamy had no conscious intention to encourage the violation of the laws of this State, he did in fact do so in violation of Canon 32. *Cf. In Re Howell,* 10 *N. J.* 139 (1952)."

The third charge was that both respondents Shamy and Pincus failed to maintain financial and business records as required by *R.* 1:21–6(a) and (b) for which *R.* 1:21–6(g) —now *R.* 1:21–6(h)—specifically provides an attorney shall be subject to disciplinary proceedings. Both of the respondents admitted that the rules were violated though Pincus asserts that the responsibility of maintaining suitable records for the law firm was assumed by Shamy. The firm maintained separate accounts in conformity with *R.* 1:21–6(a) but did not comply with *R.* 1:21–6(b). As set forth in the report, the indiscriminate practice of "shifting funds from one account to the other defeated the intended purpose of maintaining two separate accounts in the first instance," and the failure "to maintain a general ledger book" along with the "failure to make timely entries" were violative of the basic requirements in *R.* 1:21–6(b).

Shamy testified that the proper maintenance of the firm's books and records was up to him; as he put it "I assumed that responsibility and Jack Pincus permitted me to assume that responsibility." Pincus testified that, shortly after he went into partnership with Shamy, they had a disagreement as to the competence of their bookkeeper and that from then on Shamy took exclusive charge of the firm's books and records. He had complete confidence in Shamy's integrity and was not aware of any record-keeping inadequacies until the present proceedings were initiated. Judge Gerofsky in

his report concluded that both respondents had "failed to maintain financial and business records as required by *R.* 1:21-6(b)"; that Shamy had "assumed the responsibility of managing partner in respondents' law firm and that his active negligence was the proximate cause of the firm's failure to maintain proper records"; that although Pincus was "dominated by the personality of his partner his passive negligence was a contributing cause for the firm's failure to maintain proper records."

The fourth charge related to false financial statements which were submitted to lending institutions by the respondents. Shamy prepared the statements and admitted that they were false. He testified that he did not believe that any statement filed by him "in the last three years with any lending institution could possibly set forth all of my liabilities." The signature of Pincus appeared on financial statements which were false but, as the report found, "Pincus was dominated by his faithful friend and trusted partner" and "would immediately and without examination" sign statements prepared by Shamy and submitted to Pincus for signature. Shamy negotiated all of the partnership loans and, as the report states, "it was of course Shamy who needed to secure loans in order that he might have funds to satisfy his addiction to gambling."

Shamy asserts that the false financial statements were submitted after the loans were made and not for the purpose of inducing them. The report determined that "they were filed with the knowledge that they would be utilized, at least by bank examiners" and that "they were filed with the intention to deceive persons other than those who were privy to the loan negotiations." The record contains very disturbing testimony by bank officials with regard to their banking practices. Thus one bank president testified that, after a vsiit to his home by Shamy, a $100,000 loan was approved to help him pay his gambling debts. No collateral was furnished nor was any financial statement submitted at the time. Later the president "was expecting the examiners"

and made several calls to Shamy for a financial statement. A statement was then filed, as were additional statements thereafter, but the president asserted that he "never saw the statements" before the very day on which he testified.

Another bank officer testified that he did not believe he "ever looked at a financial statement" of Shamy's and that "if he wanted to borrow $100,000 tomorrow, I'd give it to him and still wouldn't look at a financial statement, even knowing he may have some problem right now." Shamy testified that, in giving his financial statements, he did not list all of his liabilities because it was obvious to him that if he listed them "the banker who gave me the loan would either be embarrassed or not look good or I didn't know what the routine was with the bank examiners, and I didn't know what the regulations were." At another point Shamy testified that the bankers he went to knew he had "heavy losses at the race track" and he "got the impression, although they didn't say so, that they didn't want to see the liabilities that I actually had." A transcript of the testimony in the current proceedings will be forwarded to the Commissioner of Banking for appropriate action.

After Judge Gerofsky's report was filed and served, this Court issued a further order to show cause why the respondents should not be disbarred or otherwise disciplined on the basis of charges relating to (1) the diversion of trust funds in violation of Canon 11, (2) the encouragement of law violations by placing bets wtih bookmakers in violation of Canon 32, (3) the failure to maintain books and records in violation of R. 1:21-6, and (4) the making of false financial statements either to induce the making of bank loans or to mislead bank examiners or others in connection with bank loans made or renewed by various lending institutions. On the return day of the order to show cause all counsel were duly heard. The testimony and the admissions in the record leave no room to doubt that there must be findings of guilt in accordance with the determinations set forth in Judge Gerofsky's report.

■■ The sole issue remaining is the extent of discipline. Shamy's gambling activities led him into the clear ethical violations for which he is now properly under suspension. We understand that his gambling activities were terminated some time ago and that the deficiencies in his law firm's record-keeping have been corrected. No loss has been suffered by any client but approximately $350,000 in obligations to the banking institutions and others remain unpaid. Many have written to us attesting in strong terms to Shamy's good reputation generally and to his fair dealings in the practice of law. These attestations cannot serve to obviate the clear need for disciplining Shamy because of his ethical derelictions. While there can be no precise formula for fixing the measure of discipline, we have concluded that under the circumstances an aggregate period of suspension of two years from the practice of law by Shamy will fairly suffice. Accordingly the respondent Shamy's present suspension, which took effect July 31, 1971, will continue until July 31, 1973 and until further order of this Court. So far as the respondent Pincus is concerned, we are satisfied that censure rather than suspension will fairly suffice and the Court records will indicate that he is hereby reprimanded.

So ordered.

*For suspension of Shamy 2 yrs to 7/31/73 and reprimand of Pincus*—Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—6.

*Opposed*—None.