IN THE MATTER OF WILLIAM E. RABB,
AN ATTORNEY AT LAW.

Argued March 22, 1977—Decided May 25, 1977.

*Mr. Samuel C. Inglese* argued the cause for Middlesex County Ethics Committee.

*Mr. Norman A. Cohen* argued the cause for respondent (*Messrs. Cohen & Kaufman,* attorneys).

PER CURIAM. After service of a complaint and specification of ethical charges by the Middlesex County Ethics Committee on respondent and the filing of an answer by the latter setting forth a categorical denial of the charges, the Committee conducted an extended hearing and entered a formal presentment against respondent.

The presentment in substance makes five charges against respondent:

1. Failure to make timely payments out of buyers' funds to persons entitled thereto after closing a realty sale and mortgage transaction.

2. Failure to maintain adequate attorney's trustee account records as required by *R.* 1:21–6(b)(2).

3. Chronic deficiencies in the trustee checking account at least from July 10, 1974 to October 7, 1974.

4. Use of $5,583.22 from the trustee checking account to purchase an automobile for personal use.

5. Failure to distribute trust funds within a reasonable time.

The only specific rule violation (in addition to *R.* 1:21–6 (b)(2)) cited in the presentment in connection with the substantive charges mentioned above is DR 9–102, dealing generally with preserving the identity of funds and property of clients.

We consider the proofs concerning and the merits of each of the charges *seriatim*.

I

In July and August of 1974 respondent represented a Mr. and Mrs. Modelfino in connection with their purchase of a dwelling in Montville. The Glen Ridge Savings and Loan Association was to provide a $36,000 mortgage. The Modelfinos were anxious to move into the property, and the closing of the title and mortgage was fixed for August 16, 1974 although respondent was to be away on vacation at that time. Respondent delegated the handling of the closing to his associate Russell Wojtenko, then employed by him on a *per diem* basis. However, the savings and loan association withheld the mortgage funds on August 16 because of defects in the survey and corrections required in the mortgage. The parties nevertheless consented to a "dry" closing to permit the purchasers to take possession. The buyers delivered their check made out to the sellers for $30,479,61 (they had previously paid a deposit of $5300) to the attorney for the sellers on the understanding he would retain it in escrow until the mortgage funds were forthcoming.

The title problems having been satisfactorily resolved, the mortgage check was made available and the transaction was concluded on the evening of August 22, 1974. Respondent attended on that occasion and was in charge of matters for the Modelfinos although Wojtenko participated because of his initial handling of the matter. It is clear beyond doubt that the Modelfinos regarded Rabb, not Wojtenko, as their responsible counsel in the transaction. Further, only Rabb was authorized to sign checks for his office. Shortly after the closing on August 22 the Rabb office arranged for issuance of a $5,934.92 check in discharge of a second mortgage and one for $78.50 to the Morris County Clerk.

Other obligations required to be paid out of buyers' funds (including the mortgage proceeds) in consummation of the

closing, together with the dates when in fact paid by respondent, are as follows:

| | | |
|---|---|---|
| Title Company | $297.50 | 10–11–74 |
| Attorney for mortgagee | 50.00 | 11– 1–74 |
| Mortgagee (tax escrow account) | 618.00 | 12–10–74 |
| Tax Collector—Lincoln Park | 114.65 | 12–11–74 |
| Attorney for seller | 50.00 | 2– 6–75 |
| Tax Collector—Montville | 377.68 | 3–12–75 |

The evidence is convincing that as of the closing on August 22, 1974 respondent possessed buyers' funds sufficient to meet all charges against the buyers, including the above listed items, as well as enough to pay his $300 closing fee except for $55.37. Repeated demands were made upon respondent by the savings and loan association for payment of the tax escrow and other tax obligations due (the property was situated in two municipalties) before payment was eventually made. Respondent admits the long delays in meeting these obligations but blames Wojtenko who he says was responsible therefor. The evidence is strongly to the contrary. The unreasonable delays in the payments were unquestionably knowing on the part of respondent and attributable to him alone.

Since the funds in question were the property of the clients, committed to respondent's custody solely to pay them out promptly on their behalf as required by the closing obligations, respondent was in violation of DR 9–102 B(4). This requires a lawyer promptly to pay or deliver to the client funds or property in the possession of the lawyer which the client is entitled to receive. A proper interpretation of the regulation extends to funds which the client has required the lawyer to pay over to others on the client's behalf. The respondent violated the regulation, and did so knowingly and without just excuse.

## II

*R.* 1:21–6(b)(2) requires attorneys to maintain

(2) a ledger book or similar record for all trustee accounts, showing the source of all funds deposited in such accounts, the names of all persons for whom the funds were held, the amount of such funds, the charges or withdrawals from such accounts, and the names of all persons to whom such funds were disbursed;

Central Ethics Unit had in the Spring of 1975 engaged Professor Gilmour of Rutgers, an accounting expert, to examine respondent's records in connection with the investigation of the charge discussed in I, *supra*. He asked respondent for all his records relative to trustee accounts. He found no ledger book or similar record complying with the specifications of the quoted rule with reference to trustee accounts. Respondent contends he had records meeting the mandate of the rule in the form of "settlement sheets", specifying, for each accident or compensation client (comprising 90%-95% of his total practice), the name of the client, the gross settlement, the counsel fee, all disbursements, and the balance due the client. The sheets did not, however, uniformly indicate when moneys had been received or paid out. The testimony makes it clear that these sheets are not the equivalent of the ledger book required by the rule. That contemplates an integrated record which will show the current status of all funds collected or received for the credit of a particular client or beneficiary, all payments out and the amount if any remaining due the client. The total shown to be due clients on all the accounts in the ledger book should theoretically equal the current balance in the trustee checking account less amounts due the attorney therefrom.

We need not burden this opinion to specify the obvious and numerous respects in which the settlement sheets failed to meet the requirement of a trustee ledger book. Respondent concedes them. It is clear that respondent had been

in default of this requirement ever since he began practice independently in 1973 and at least until the beginning of this investigation in 1975.

 Respondent's excuse that he left the setting up of his books to a firm of accountants will not justify his practices. The responsibilities imposed by the disciplinary rules are personal to each practicing attorney. Moreover, he concedes the accountants told him they wanted no responsibility for his trustee accounts.

## III

Because of the unsatisfactory condition of respondent's records Professor Gilmour in 1975 undertook an investigation of his trustee checking account to determine whether there were shortages therein from July 1, 1974 to October 7, 1974.[1] The method used was to begin with the making of each payment by respondent to a client; then to ascertain the source of the funds, e. g., a settlement with an insurer, and the date of their receipt by respondent. Gilmour applied the presumption that the funds received should have been in the trustee checking account from the date of respondent's receipt of them until their disbursement out to the client. Gilmour's conclusions as to minimum shortages in the trustee account were based on the differences between what should have been and what were in fact the daily balances in the trustee account. A summary of the witness's conclusions showed shortages varying between $353.86 and $9,103.34 on almost every day between July 10, 1974 and October 7, 1974.

Respondent, however, has demonstrated that Gilmour's statement of shortages is vulnerable in at least two respects. First, he was charged by Gilmour with $3600 representing

---

[1]The period selected was arbitrary, limited by the extent of the work for which Central Ethics wished to contract with Professor Gilmour.

an insurance company check from July 16, 1974 through the period in question, whereas, in fact, respondent's account had been backcharged that amount by his bank on July 24, 1974 for insufficiency of funds to support the insurance company check. Moreover, respondent had paid out $2,000 to the client on the strength of that bad check on July 16. Second, because of respondent's sloppy record keeping, Professor Gilmour had charged respondent's trustee account on a Nagazina matter for some $2500 (or $2850) as of March 15, 1974 and until October 21, 1974, whereas, in fact, respondent had not received the funds until October 21, 1974.

It thus appears that on proper correction of the Gilmour "shortages" by the amounts and for the periods referred to, most of the days for which such shortages were indicated would be eliminated. As to those dates for which apparent shortages would still remain, the evidence indicates, however, that these figures may not necessarily represent actual shortages, or in the amounts indicated. This is because of respondent's frequent practice of not transferring promptly out of the trustee accounts the money due him as a fee on a case. Respondent would permit fees due him to accumulate for extended periods and then transfer lump sums out of the trustee account to his regular account — on one occasion to the extent of $10,000. Although respondent conceded that at the time of such transfers he had no ready means of ascertaining how much was due him in fees from the trustee account, we cannot find that it has been clearly and convincingly established that respondent was not in fact owed such sums.

Thus, while we deprecate respondent's habitual failure with reasonable promptness to remove from the trustee account such moneys as were due him for fees (and to document such removals by entries in a proper ledger), we cannot say that the proofs have satisfactorily established the existence of shortages in respondent's trustee account during the period in question. Supporting this con-

clusion is the fact that, so far as we are aware, no specific client of respondent has come forward to claim misappropriation by him of funds belonging to such a client out of the trustee account.

We are thus constrained to dismiss the charge of shortages, although respondent should be forewarned that his management of the trustee account for the period in question was distinctly unsatisfactory.

## IV

On December 20, 1974 respondent issued a check out of the trustee bank account for $5,583.25 to a car dealer in payment for a new automobile. Respondent undertakes to explain this highly irregular action as an inadvertent error caused by his haste and excitement at hearing that the car he had ordered was ready. The natural inference from the explanation is that his intent was to use a check from his regular account. That, however, loses credibility when one considers, not only that the trustee and regular account blank checks were in different colors but that the proofs are that respondent had insufficient funds in his regular checking account to pay for the car at the time.

Respondent attempted an alternate defensive tack before the Ethics Committee by arguing that attorney's fees were due him out of the trustee account at the time he drew the car money therefrom sufficient to make up the $5,583.25 depletion of the trustee account. Our careful review of the testimony fails to substantiate that fact. But even if it were true, respondent's action would still not be justified. Under respondent's factual hypothesis the appropriate initial step before using the money for a personal expense would have been to transfer the fees from the trustee to the regular account (making a proper entry in a trust ledger).

One of the reasons for our reluctance to credit respondent's attempted justification for the withdrawal on the

basis of fees owing to him is that, allegedly on the advice of his accountants, he put $5,583.25 of his own money back into the trustee account on April 19, 1975 and admits he has no knowledge of taking it out again thereafter.

█ Although, as noted above, there is no indication that any particular client has sustained any loss as a result of respondent's irregularities in the maintenance and management of the trustee account, the withdrawal for the car on December 20, 1974 was in egregious disregard of the inviolability of an attorney's trustee account. The evidence is clear and convincing that it was intentional, even if not fraudulent in purpose. Even temporary diversions of trust funds for an attorney's personal purposes are improper.

Diversion of trust funds to an attorney's personal use is a patent violation of professional ethics. *In re Shamy,* 59 *N. J.* 321 (1971). Such conduct was expressly prohibited by former Canon 11. *Ibid.* It is by plainest implication from DR 9–102 and *R.* 1:21–6(a)(1) and (b)(2) and by common knowledge of the bar unethical conduct. Respondent is found guilty of this charge.

V

The Ethics Committee has, in addition to the delays involved in the Modelfino matter, (I, *supra*), charged miscellaneous other failures by respondent to distribute trust funds within a reasonable time. These include moneys due clients and doctors. However, respondent has submitted *prima facie* explanations of all these instances, and it cannot be said that, except for the Modelfino matter, the charges are established by clear and convincing evidence, as required by our practice.

VI

Respondent contends he was denied due process in that (a) he was charged in the presentment with rule violations of which he was not given advance notice before the hear-

ing; and (b) Mr. Inglese, who investigated and prosecuted the matter for the Ethics Committee, influenced the Committee's presentment. The latter contention may be dismissed summarily. We have a certification by the chairman of the Ethics Subcommittee that heard this matter and formulated the presentment that Mr. Inglese played no role in drawing the presentment, had no discussions of the matter with the Committee, and did not vote on it. The contention is without merit.

As to the other due process argument, we note that the original complaint specifies DR 9–102 B(4) and DR 9–102 C, as it applies to R. 1:21–6 (b) (2), as having been violated. The presentment specifies R. 1:21–6(b) and DR 9–102 as a whole. We find no impermissible broadening of the complaint in the presentment. The specification of disciplinary rule numbers is not the heart of a disciplinary complaint. That is, rather, comprised by the statement therein of the substance of the alleged offending conduct. In any event, we have found respondent responsible for unethical conduct only in respect of (a) failure to make timely payment of obligations due on account of the real estate matter; (b) failure to maintain adequate trustee account records; and (c) the improper diversion of trustee accounts for the purchase of a personal automobile. Each of these derelictions is charged in the original complaint and specification of charges as well as in the presentment. Each constitutes unethical conduct, and respondent has clearly recognized each charge and defended against it both before the Ethics Committee and before this Court.

Respondent has been accorded adequate notice of the charges of professional misconduct he was called upon to meet.

It is our judgment that the charges we have found here to be established represent substantial deviations from the code of conduct required of the bar, and, in the light of all attendant circumstances, merit a suspension from the practice of law for six months, and until the further order of

the Court. The disciplinary sanction would have been more substantial had there been any demonstration of client losses in relation to respondent's activities.

So ordered.

*For suspension for six months*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and SCHREIBER and Judge CONFORD.—7.

. *Opposed*—None.

## O R D E R

It is ORDERED that WILLIAM E. RABB of Woodbridge be suspended from the practice of law for six months and until further order of the Court, effective June 13, 1977 and it is further

ORDERED that WILLIAM E. RABB be and hereby is restrained and enjoined from practicing law during the period of his suspension.