IN THE MATTER OF JOHN R. KNOX, AN ATTORNEY AT LAW.

Argued March 6, 1984—Decided July 13, 1984.

*David E. Johnson, Jr.*, Director, Office of Attorney Ethics, argued the cause for complainant Disciplinary Review Board.

*William J. McGovern* argued the cause for respondent (*McGovern and Roseman*, attorneys).

PER CURIAM.

Our painstaking independent review of the record leads us to the same conclusion as was reached by the Disciplinary Review Board (DRB), namely, that respondent should be suspended from the practice of law for a period of three years, with certain conditions to be imposed should readmission be granted. The DRB's report, which, with a single exception referred to below, we now adopt as our own, is as follows:

"This matter is before the Board on an appeal by the Division of Ethics and Professional Services following dismissal by the District XI Ethics Committee of an ethics complaint that charged the respondent with misappropriation of client trust funds and other recordkeeping violations. A review of the records before the Board disclosed the following:

"A. *Trust Account Problems*

"In March of 1980, an audit of the respondent's trust account was conducted by the Division of Ethics and Professional Services. That audit revealed that from November of 1974 through February of 1980, the respondent was out of trust by varying amounts at least 15 times during the five-year period reviewed, including:

| DATE OF NEGATIVE BALANCE | AMOUNT OF NEGATIVE BALANCE | CLIENT |
|---|---|---|
| November, 1974 | ($1.38) | William Partridge |
| July, 1976 | ($374.46) | Sussex Boy Scouts |
| September, 1976 | ($18.00) | Warren J. Padfield |
| November, 1977 | ($6,294.50) | Aeroflex Corporation |
| December, 1977 | ($27,859.74) | Forrest Lakes, Inc. |
| June, 1978 | ($524.60) | Central Nat'l Life Ins. |
| June, 1978 | ($122.65) | Chester Guzik |
| June, 1978 | ($30.00) | T. Young |
| September, 1978 | ($792.97) | Bernard, Durst & Dilts |
| April, 1979 | ($0.20) | Scheinler Est. |
| July, 1979 | ($2,812.54) | Kenneth H. Layton |
| September, 1979 | ($17,937.38) | Kerstner & Knox |
| November, 1979 | ($0.04) | Herman Eisenberg |
| December, 1979 | ($5,179.74) | Rose Property |
| December, 1979 | ($4,018.44) | Catherine Kenney |
| | ($66,759.04) | |

"The Division of Ethics and Professional Services accountant contended that each negative balance indicated an invasion of funds belonging to one client on behalf of another. Respondent attempted to explain the negative balances by stating that in certain cases, the negative balance was offset by combining accounts or by crediting fees earned or anticipated in other matters. He further related the overdrafts to his alcoholism, which, he contended, resulted in a failure to bill clients properly and to maintain the required attorney records. Additionally, at the hearing before the ethics committee respondent claimed that his wife, who was his bookkeeper, improperly debited and credited various account ledgers. By his own admission, respondent withdrew $3,800 attributed to the Catherine Kinney ledger prior to receipt of any trust funds for that client or for the two allegedly related client matters, Wardelich and Mooney. In fact, no funds were deposited to the credit of any of these three client accounts until October 10, 1979, one year and eight

days after the $3,800 withdrawal. Thus, for that period of time, respondent invaded the funds of another client.

"Similarly, respondent attempted to explain the previously noted negative balances in the Forrest Lakes, Inc. ($27,859.74) and Kerstner and Knox ($17,937.38) accounts, by contending that these matters were somehow related to Westby Corp. and Frank Kerstner, which accounts both had positive balances standing to their credit. This sleight of hand, however, still resulted in a negative total balance of $168. Additionally, the respondent was unable to explain coherently the interrelationship of the four client accounts, and conceded that Westby, which had a positive balance of $1,395.96, might not belong in the group after all. He subsequently exhibited certain additional confusion with regard to these records.

"In the Central National Life Insurance matter, respondent admitted that he drew a trust account check for title insurance when no funds had been received on behalf of that client. He indicated that the check should have been drawn against his business account since he had not billed Central National for services performed. As of the time of the ethics hearing three years later, he still had not billed the client. He contended that the check actually represented fees that he had not withdrawn from other client accounts. When pressed by the District XI Ethics Committee hearing panel members, he was unable to specify the source of the alleged fees due.

"Respondent attempted to explain a negative balance of $6,294.50 in the Aeroflex Corporation account by claiming that another client account (Shaw) with a substantial credit balance should have been charged, although that client had no relationship to Aeroflex. His testimony on that transaction is telling:

"I think probably what I did was to again buy my peace in effect, and write the check, and I'll straighten it out. And it should have been chargeable against something else. I really need the time to go over the individual accounts.

"In Rose, respondent attempted to use the very same client account referenced in Aeroflex, *supra*, to excuse a negative ledger account balance of $5,179.74. Again, according to re-

spondent, the Shaw account, which showed a credit of more than $7,000, contained some unspecified amount of fees due to him.

"Although requested by the hearing panel, the respondent did not provide any reconstruction of his accounts to support his various defenses of offset of fees and combination of client accounts. Additionally, despite representations that a certified public accountant was retained on respondent's behalf, no report was ever provided.

"B. *Layton Matter*

"The respondent first represented Kenneth H. Layton in the early 1970's. Their relationship was apparently an ongoing one. In the spring of 1979, Layton specifically retained the respondent to represent him on the sale of his business, the Springdale Farmers Market, to a Mr. Cilento. On June 13, the parties met at the respondent's office to finalize the sale. At that time, a $20,000 down payment in the form of a money order, which was to be held in escrow, was endorsed by the purchaser for deposit in the respondent's trust account. In addition, to memorialize the terms of the transaction, the respondent drafted a memorandum of sale, which was to serve further as a receipt for the $20,000. A formal contract of sale was never signed, and the closing was held on July 6 at respondent's office.

"At the time of the closing on July 6, 1979, Layton received only $20,000 from the sale, which represented the funds delivered by the purchasers on that day rather than the total of $40,000 that he had anticipated. The respondent informed Layton that the July 6 action was a 'temporary' or 'partial closing' and that the $20,000 provided by the purchaser on June 13 would have to be retained since there were further steps to be taken. The respondent continued to stall Layton over the next three months, even after the notice of the sale appeared in the newspaper, by advising Layton that there were further

problems with zoning and maps. Layton frequently left messages with the respondent's secretary. At the end of October, 1979, the respondent and Layton met at the respondent's office. Layton testified to their conversation on that day as follows:

"He said, 'Come in and sit down.' He got up from his desk. He walked around the back to a straight back chair by a fireplace. He crossed his legs and he put his hand on the side of his face, and he said, 'Ken, I used your money. I lied to you.' He said, 'I'll probably go to jail, lose my family. I'll lose my house.' And I said, 'I don't want anyone to lose their family, house. I don't want to see any trouble happen to anyone.' He said, 'I can soon have the money.' I said, 'How soon?' He said, 'Soon.' I said, 'I have no receipt from you for nothing,' And I said 'If you can have it soon, if I had a receipt.' He said, 'I'll give you a receipt.' He said, 'I'll make it by the 24th day of December, the day before Christmas, but it will be long before that.' So he gave me a receipt. It was supposed to be a receipt. And he handed it to me signed, folded it and handed it to me. I took it home.

"That receipt, marked as C–2 in evidence, was actually a promissory note back-dated to June 25, 1979, although the note was not executed or delivered until mid-October. The note provided for interest of 10% on the principal of $20,000, was due December 24, 1979, and contained the notation 'Re: Forrest Lakes Water Co.,' Layton did not review the note at the time it was given to him, and thus believed he had been given a receipt, as requested. At the hearing before the District XI Ethics Committee, Layton testified that he was unaware of any transaction with Forrest Lakes Water Company and that respondent had not raised the subject of the water company in their conversation. Despite his 28 years in business, Layton had never given nor received a promissory note. He never borrowed or loaned funds, and had never had a mortgage on any of his properties. Nor had he knowledge of respondent's involvement with Forrest Lakes Water Company and simply assumed that respondent was Forrest Lakes' attorney. He flatly denied authorizing the loan of his $20,000 to Forrest Lakes.

"On December 20, 1979, Layton telephoned respondent and advised that he would pick up the $20,000 on December 24. He was accompanied to respondent's office on December 24 by

Cilento. That meeting consisted only of going over certain papers. Layton walked out when he realized he would not get his money that day. Layton then consulted another attorney and was thereafter reimbursed by respondent by his personal check dated January 22, 1980.

"The respondent contended that Layton agreed to loan $20,-000 to respondent personally, and that trust account check # 1783 dated June 25, 1979 in the amount of $20,147.54 issued thereafter. There was apparently no discussion between the parties of a promissory note, security for the loan, interest to be paid or advisability of independent counsel for Layton. The record does not reflect any contention by the respondent that he advised Layton of either his extensive personal involvement with the Forrest Lakes Water Company as its President and Chief Administrative Officer, or of the fact that his office performed most of the functions of the water company, including billing, collections and meter reading, for which Knox was owed between $30,000 and $40,000. Nor is there any indication that Layton was told that the respondent had loaned about $12,000 of his own funds to the water company. Also pertinent, but not disclosed to Layton, was the fact that respondent and his wife owned a significant portion of Forrest Lakes, Inc., a reserved undeveloped subdivision that was to be serviced by the water company. The water company was in fact created to drill a well so that the property could be subdivided and sold.

"Respondent denied giving excuses to Layton for not paying the money in July and August. He stated that Layton had been advised prior to December 24 that he would not be able to pay the principal sum of $20,000 at that time. Respondent further noted that his wife had between $25,000 and $20,000 available but he did not want to borrow from her. Respondent also advised the Committee that his personal wealth consisted of assets in excess of $457,000. When he was asked at the hearing before the District XI Ethics Committee why he did not liquidate some of his assets to pay Layton, he replied as follows:

"Number one, it was Forrest Lakes Water Company's obligation. And I anticipated that the Forrest Lakes Water Company was going to get the proceeds from the Farmers Home Administrative mortgage, would get our rates up under a service contract that I had performed, my office staff had actually functioned for the billings, and staff. At that point they owed me.

## "C. *Alcoholism Defense*

"One aspect of respondent's defense was that he suffered from alcoholism at the time of the offenses. Since March 4, 1979 he has abstained from drinking and terms himself a recovering alcoholic.

At hearing before the District XI Ethics Committee the respondent testified that his problem with alcohol began in 1957. His wife, too, became an alcoholic. Indeed, the respondent, who was suspended for 6 months by the Supreme Court in 1971 for his conviction of failure to file a federal income tax return for one year, also offered his alcoholism as a mitigating circumstance at that time. *In re Knox,* 58 *N.J.* 218 (1971). Subsequent to his reinstatement, the respondent again began drinking, with sporadic periods of sobriety. He became increasingly dependent on alcohol. On March 4, 1979, he stopped drinking and sought help at an in-house alcoholic rehabilitation program. In testimony given by a therapist in that program, it was noted that a recovering alcoholic normally encountered difficulty with stress and with functioning at an optimum level for an initial 3 to 6 month period and for as long as one to two years subsequent to attaining sobriety. The therapist was unable to advise whether respondent's dependence on alcohol could account for his misuse of client trust funds, and noted only that the alcoholic characteristic of an inability to concentrate combined with impulsivity, also an alcoholic characteristic, could possibly be related to the misuse of client funds. In addressing the impact of alcohol on his conduct during 1978 and 1979, the respondent indicated that he could work through the day and drink heavily at night. Although he stated that the end result of his work efforts were not jeopardized, he found that it took him longer to complete various tasks.

"The District XI Ethics Committee adopted the respondent's explanation of the negative balances in respondent's client trust ledgers. Specifically, the Committee noted that the negative balances 'were accounted for in each instance by a balance in a corresponding ledger for the same client or the same general transaction.' The Committee found that the accounts 'although unorthodox in their irregularity and confusing in their results, were, in fact, indirectly accurate.' No unethical conduct was found.

"As to the Layton matter, the Committee noted the client's 'obvious air of nearly provincial simplicity in his personal as well as business approach. On the one hand, he insists that he never "loaned" any money to Knox, yet he candidly admits he trusted Knox and still trusts him, and leaves the impression that, he probably would have consented to the loan.'

"The Committee further analyzed the situation as follows:
"The test is not so much what Mr. Layton understood, but rather what Mr. Knox understood (or could reasonably infer) from the statements and conduct of Mr. Layton. Accordingly, the panel finds that although Layton did not intend to consent to Knox using the $20,000, it was not unreasonable for Knox to have misunderstood Layton's statements (particularly in view of Layton's admitted trust in and respect for Knox, which was affirmed as continuing, even at the hearing). The panel is not unmindful that such misunderstanding on Knox's part was necessarily influenced by his own personal anxiety over the circumstances which created the need for the loan, and that as a general rule attorneys would be better advised to refrain from such personal transactions with clients. Poor judgment, however, is not automatically unprofessional or unethical conduct, and in this instance is the only transgression by Knox.

"As to respondent's alcoholism, the Committee stated that although it may have contributed to his poor judgment, it would neither excuse nor 'mitigate any wilfull wrongdoing if such were found to have occurred.' The Committee then dismissed the ethics complaint.

"An appeal from this dismissal was taken by the Division of Ethics and Professional Services. Upon review, the Disciplinary Review Board directed that the parties brief the matter. Thereafter, the Board determined to grant the appeal and treat the matter as a Presentment. Hearing before the Board was

held on March 16, 1983. At that time, the Board determined to grant the respondent's motion to refer the case to the New Jersey State Bar Association's Alcohol Advisory Committee for review of the record on the question of mitigating circumstances relative to discipline to be imposed.

"The Alcohol Advisory Committee (hereinafter AAC) reviewed the file and interviewed respondent and his witnesses prior to issuing its report. While the AAC was in total agreement that the respondent suffered from alcoholism during the time encompassed by the ethics complaints, the Committee was unanimous in its conclusion that the alcoholism was *not* a factor in Layton. Contrary to respondent's assertions, the Committee found that he was

"not suffering from the effect of alcoholism in a way that impaired his judgment or from any disease or syndrome that would impair his professional ability to practice law as required by the ethical considerations that lawyers are subject to.

\* \* \* \* \* \* \* \*

"In this matter, the AAC has concluded that there is no causal connection between the disease of alcoholism and the alleged misconduct of Mr. Knox in June, 1979.

"In support of this conclusion, the AAC noted that respondent handled all aspects of the Layton sale in proper fashion, without any evidence of alcohol impairment. Additionally, the respondent believed that the manner in which he transacted the loan with Layton was proper. Furthermore, although he had resolved to get rid of his interest in the water company while undergoing treatment of alcoholism, he failed to follow through on this resolve once released. Rather, he 'chose to save the company through the use of his client's funds \* \* \*. The decision to save the company was a calculated one with no indication that respondent's alcoholism affected that decision one way or the other.'

"Similarly, when Layton demanded return of the funds, his response to Layton's request was not, in the Committee's considered opinion, in any way related to his alcoholism.

"However, with regard to the irregularities in respondent's record, the Committee found a probable causal connection between the alcoholism and noted irregularities.

"The AAC concluded that the respondent is successfully recovering from the disease of alcoholism, and that he does not present a continuing danger to the public insofar as his *alcohol-related* past problems are concerned. The AAC recommended that in the event respondent is allowed to continue to practice law, he be required to continue his Alcoholics Anonymous participation, that his activities be supervised by another member of the bar, and that his accounts be audited on a regular basis for at least two years.

### "CONCLUSION AND RECOMMENDATION

"Upon extensive review of the full record, and following oral argument, the Board finds clear and convincing evidence of unethical conduct by the respondent. The respondent intentionally utilized $20,000 that belonged to his client, Layton, to his personal benefit and without authorization, thereby violating *DR* 9–102. The Board fully agrees with the conclusion of the AAC that this misappropriation bore no causal relationship to the respondent's alcoholism. The District XI Ethics Committee, in its review of this matter, altered the appropriate test for determining misconduct from an objective to subjective one, thereby misperceiving the obligations of an attorney in his dealings with clients, and client trust funds in particular. The facts of this case, objectively reviewed, leave no doubt that Layton made no loan to the respondent and that the respondent simply misappropriated his client's funds. Additionally, respondent's stated wealth at the time, as well as his wife's financial status, demonstrate his intent to take advantage of Layton by placing at risk the client's funds rather than his own.

"In addition to the Layton misappropriation, the respondent took a haphazard approach to his attorney trust account from 1971 through the time of initial audit of that account in March

of 1980. During that time, the individual client accounts were frequently out of trust, a further violation of *DR* 9–102. Respondent's various explanations of these improprieties are, at best, confusing. Even accepting his explanations, the accounts did not balance. His conduct is even more inexplicable given the respondent's more than twenty years at the bar as of 1971, as well as his 1968 position as chairman of the Sussex County Ethics Committee. A lawyer of that experience should have recognized the impropriety of his actions. Moreover, the Board does not accept respondent's position that his wife was at fault in improperly debiting and crediting certain accounts. The responsibility for properly overseeing and maintaining these accounts rests solely with the attorney. The Board has, however, given great weight to the AAC's conclusion that these improprieties could have been causally related to respondent's alcoholism. Nonetheless, this does not explain the respondent's continued improprieties in this area subsequent to his regaining sobriety in late Spring, 1979 and until the March, 1980 audit.

"Respondent's misconduct herein, together with his prior disciplinary history, requires the imposition of severe discipline. In respondent's favor, no clients were irreparably harmed, and, in Layton, restitution was made by the respondent. Additionally, as to the numerous trust account violations between 1971 and 1979, respondent's alcoholism has been considered as a mitigating circumstance. The Board has also considered the respondent's apparently successful ongoing recovery from alcoholism. Nonetheless, a lengthy suspension is necessary to protect the confidence of the public in the integrity of the Bar. The Board therefore recommends that the respondent be suspended from the practice of law for a period of three years. The Board further recommends that respondent's readmission be conditioned upon proof of his continuing sobriety. Additionally, the conditions recommended by the AAC should be imposed on respondent at the time of his readmission."

As the DRB points out, this is not respondent's first brush with the disciplinary system. See *In re Knox,* 58 *N.J.* 218

(1971). The transgressions he committed are most serious, and there is little doubt that had they taken place after this Court's decision in *In re Wilson*, 81 *N.J.* 451 (1979), we would have little choice but to disbar.

We are constrained to recognize, however, a certain lack of consistency in pre-*Wilson* disciplinary opinions on attorney misappropriation. *Compare In re Ditri*, 71 *N.J.* 173 (1976) (misuse and misappropriation of substantial trust funds; discipline imposed: disbarment, even in the face of a proffered resignation with prejudice), *and In re Fruchter*, 64 *N.J.* 435 (1974) (manipulation of trust account and conversion of trust funds to own use; discipline imposed: three-years suspension), *with In re Rabb*, 73 *N.J.* 272 (1977) (infractions included chronic deficiencies in trustee checking account, temporary diversion of trust funds for lawyer's personal use, and failure to distribute trust funds within a reasonable time; discipline imposed: six-months suspension), *and In re Power*, 72 *N.J.* 452 (1977) (violation of fiduciary obligation with respect to escrow account, giving of false testimony in reference thereto in Superior Court action, and improper invasion of one client's trust funds for benefit of another client; discipline imposed: three-months suspension, in light of full restitution, no prior record, and context of "single transaction").

We are willing to accord respondent the benefit of what arguably is some absence of symmetry or even of coherence in the foregoing pre-*Wilson* cases. See *In re Wilson, supra*, 81 *N.J.* at 455–56. In addition, we conclude that the mitigating factors referred to by the DRB are deserving of some weight, although (and this represents the only feature of the DRB report that we do not adopt) we discount the impact of respondent's alcoholism as a mitigating circumstance in respect of the trust account violations between 1971 and 1979. For today's purposes we can put them to one side, as our decision is the same with or without consideration of those earlier infractions, given respondent's continuing sobriety from March, 1979 up to and beyond the March, 1980 audit. To be more specific, we do

not, in this decision, pass on the availability of, or, assuming availability, the weight to be accorded, any so-called "alcoholism" defense in disciplinary matters.

The factors recited above move the Court to withhold the ultimate sanction, although it must be apparent to any reader of this opinion—and, we trust, particularly to respondent—that Mr. Knox has meandered perilously close to the precipice of disbarment.

Respondent is suspended from the practice of law for three years. We need not now address the question of what specific conditions will be imposed in the event respondent is, after the period of suspension, restored to practice, other than by reference generally to the conditions recommended in the DRB report. Respondent is to reimburse the Office of Attorney Ethics for administrative costs, including the production of transcripts.

So ordered.

*For disbarment, suspension and reprimand*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, O'HERN and GARIBALDI-6.

*Opposed*—None.

## ORDER

This matter having been duly considered by the Court, It is ORDERED that JOHN R. KNOX of ANDOVER be suspended from the practice of law for a period of three years, effective immediately, and until further order of this Court; and it is further

ORDERED that respondent reimburse the Office of Attorney Ethics for administrative costs, including the production of transcripts; and it is further

ORDERED that respondent be restrained and enjoined from practicing law during the period of his suspension; and it is further

ORDERED that respondent comply with Administrative Guideline No. 23 of the Office of Attorney Ethics dealing with suspended, disbarred or resigned attorneys.

WITNESS, the Honorable Robert N. Wilentz, Chief Justice, at Trenton, this 13th day of July, 1984.