# Jay L. Pickus

## v.

# Virginia State Bar

Record No. 840569

September 5, 1986

Present: All the Justices

*Anthony F. Troy (James C. Roberts; Robert D. Seabolt; Mays, Valentine, Davenport & Moore*, on briefs), for appellant.

*Gregory E. Lucyk, Assistant Attorney General (Gerald L. Baliles, Attorney General; James T. Moore, III, Assistant Attor-ney General*, on brief), for appellee.

CARRICO, C.J., delivered the opinion of the Court.

This is an appeal of right from an order of the Virginia State Bar Disciplinary Board (the Board) suspending for one year the license of Jay L. Pickus to practice law. The suspension was based upon a finding that Pickus had violated several provisions of the Code of Professional Responsibility in his handling of three real estate transactions.

Licensed in October 1977, Pickus worked for other attorneys off and on until June 1978. At that time, he established a practice on his own in Richmond with "very little" experience in handling real estate matters. In December 1978, he met Robert O. Davis, Jr., who was engaged in buying and selling real estate. Davis employed Pickus to "handle all [his] business."

The three transactions in question were the first Pickus handled for Davis. In two of the cases, occurring in March and June 1979, Capital Savings and Loan Association agreed to lend Davis money for the refinancing of existing deeds of trust totaling $107,108.40 on two pieces of property in Richmond. Pickus acted as closing

attorney in both cases. Capital Savings instructed Pickus to satisfy the prior deeds of trust and to obtain mortgagee title insurance policies insuring that the new loans constituted first liens.

Pickus obtained commitments for title insurance, and Capital Savings issued him checks totaling $143,323.53, covering the proceeds of the two loans. Pickus endorsed the checks and turned them over to Davis upon the latter's representation that he would satisfy the prior liens and obtain their release. Davis failed to satisfy the liens, and, without checking the land records, Pickus certified to the title insurance company that the prior liens had been satisfied and that the loans of Capital Savings were secured by first deeds of trust. The insurance company issued policies insuring the loans as first liens. Ultimately, Capital Savings made claim against the insurance company, and the claim was settled for $29,195.85.

In the third transaction, occurring in April 1979, Virginia First Savings and Loan Association agreed to lend Davis money to refinance an existing $100,000 deed of trust on his own home. Pickus acted as settlement attorney in this transaction. Virginia First Savings instructed Pickus to satisfy the prior trust and to obtain a mortgagee title insurance policy insuring that the new loan would constitute a first lien.

Pickus obtained a commitment for title insurance, and Virginia First Savings issued him a loan proceeds check in the amount of $140,000. Pickus endorsed this check and delivered it to Davis after the latter became "very coercive" and insisted he would "take care" of satisfying the prior deed of trust himself. Davis did not satisfy the prior trust, and Pickus did not apply for or obtain a title insurance policy. Pickus did prepare and deliver to Virginia First Savings a settlement statement indicating that the prior trust had been satisfied, but he did not check the land records to determine whether the prior lien had been released.

Pickus received no part of the loan proceeds involved in the three transactions. He testified before the Board that he paid the money over to Davis because he trusted him "implicitly."

Davis also testified before the Board. At the time he testified, he was an inmate at Powhatan Correctional Center, and he previously had served a sentence at Allenwood Federal Prison Camp in Pennsylvania. Davis testified that he persuaded Pickus to turn the loan proceeds checks over to him because his bank would give him immediate credit while Pickus' bank would wait for the checks to

clear. Davis stated that Pickus did not know he, Davis, had not satisfied the prior liens and that Pickus was "very surprised" when "these transactions came to light" in 1981.

A former Assistant United States Attorney who had participated in the investigation of charges against Davis also testified before the Board. He described Davis as "a professional con man" involved in "bank fraud in connection with real estate transactions." The witness said Davis was "[v]ery good at [defrauding banks]."

In suspending Pickus' license, the Board found that he had violated Disciplinary Rules 1-102(A)(1), (4), and (6), 6-101(A)(1), (2), and (3), and 9-102(A) and (B) of the Code of Professional Responsibility. This Code was revised in 1983, after the time the transactions in question occurred. Rules of Supreme Court of Virginia, Va. Code 1984 Added Volume 11, at 219. In the discussion which follows, we will refer to the pre-1983 version of the Code of Professional Responsibility.

*The Alleged Violation of DR 1-102(A)(1), (4), and (6)*

These Disciplinary Rules provided:

*DR 1-102 Misconduct.*
(A) A lawyer shall not:
  (1) Violate a Disciplinary Rule.
  . . . .
  (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
  . . . .
  (6) Engage in any other conduct that adversely reflects on his fitness to practice law.

216 Va. 1064, 1065-66 (1976).

Pickus argues that DR 1-102(A)(1) and (6) have no "independent significance in this case" and that the question whether he violated DR 1-102 in any respect "hinges upon the sufficiency of the Bar's evidence regarding Pickus' alleged violation of D.R. 1-102(A)(4), pertaining to 'dishonesty, fraud, deceit, or misrepresentation.'" Pickus argues further that in establishing a violation of DR 1-102(A)(4), a showing of scienter is required; the language of the Rule imports "fraudulent or deceitful activity, the

proof of which rests upon a showing of intentional conduct or at least knowing acquiescence."

Yet, Pickus says, the proceeding before the Board "is void of any evidence that [he] made any deliberate or knowing misrepresentations, or that he had any specific intent to defraud, or that he deliberately misrepresented a state of facts." Indeed, Pickus says, the Board made "findings of fact to the contrary, indicating that [he] acted upon the representations of . . . Davis . . . in certifying to the title insurance company that prior deeds of trust had been satisfied." The evidence as a whole, Pickus concludes, was "overwhelming that [he] never knowingly or intentionally made a misrepresentation," and, hence, "the Board's finding that D.R. 1-102 was violated must be vacated."

We will assume, without deciding, that scienter is an essential element in the establishment of a case of misrepresentation under DR 1-102(A)(4). *See Gibbs* v. *Virginia State Bar*, 232 Va. 5, 348 S.E.2d 202 (1986) (this day decided). It does not follow, however, that we must reverse the Board's finding that Pickus violated DR 1-102(A)(4). We think that the element of scienter was established by the clear proof required in disciplinary proceedings. *Seventh District Committee* v. *Gunter*, 212 Va. 278, 284, 183 S.E.2d 713, 717 (1971).

Pickus certified to the title insurance company that the prior liens involved in the two Capital Savings transactions had been satisfied and released of record. The act of making this certification was certainly knowing and intentional. Necessarily implicit in Pickus' certification was the representation that *he*, or someone for whom he was responsible, had satisfied the prior liens and ascertained from the land records that those liens had been released. Pickus performed the same sort of knowing and intentional act and made the same type of representation when he showed on a settlement statement that the prior deed of trust involved in the Virginia First Savings transaction had been satisfied.

These representations, however, were not true, and Pickus knew they were not true. Neither he nor anyone for whom he was responsible had satisfied any of the prior liens or ascertained whether the liens had been released of record, and he, of course, knew that neither he nor anyone for whom he was responsible had performed any of these necessary acts. We conclude, therefore, that the Board did not err in finding Pickus had violated DR 1-102(A)(4).

In reaching this conclusion, we have not overlooked Pickus' argument that the Board found he had acted upon the representations of Davis in certifying to the title company that the prior liens had been satisfied. We believe, however, it is immaterial that Pickus may have acted upon Davis' representations. In receiving and handling the funds entrusted to him by the lending institutions, Pickus occupied a fiduciary relationship vis-a-vis those institutions, with a transcendent duty to disburse the funds as they directed, rather than as Davis wished. It avails Pickus nothing, therefore, to protest that he acted upon Davis' representations.[1]

■ Remaining in this aspect of the case is the question whether Pickus violated DR 1-102(A)(1), which prohibits the "[violation of] a Disciplinary Rule," and DR 1-102(A)(6), which proscribes "any other conduct that adversely reflects on [a lawyer's] fitness to practice law." Because Pickus violated DR 1-102(A)(4) and, as we hold *infra*, other Disciplinary Rules as well, it follows that he also violated DR 1-102(A)(1) and (6).

*The Alleged Violation of DR 6-101(A)(1), (2), and(3)*

These Disciplinary Rules provided:

*DR 6-101 Failing to Act Competently.*
(A) A lawyer shall not:
  (1) Handle a legal matter which he knows or should know that he is not competent to handle, without associating with him a lawyer who is competent to handle it.
  (2) Handle a legal matter without preparation adequate in the circumstances.
  (3) Neglect a legal matter entrusted to him.

216 Va. at 1106, amended at 218 Va. 192 (1977).

---

[1] Because it is immaterial that Pickus may have acted upon Davis' representations, we reject Pickus' argument that a member of the Board improperly failed to recuse himself. Pickus asked for the recusal because the Board member had previously represented Davis in a real estate transaction. Pickus' attorney told the Board that the challenged member's prior experience might place him in the position to say, "well, I wasn't deceived by Mr. Davis, [so] I don't understand why Mr. Pickus was deceived by Mr. Davis." The real issue was not whether Davis deceived Pickus but whether Pickus deceived the lending institutions or the title insurance company, and the Board member's prior experience did not preclude him from participating in the consideration of this issue.

Pickus argues that the Disciplinary Rules and the Ethical Considerations provide little guidance in determining what constitutes incompetence, inadequate preparation, and neglect within the meaning of DR 6-101(A)(1), (2), and (3). With reference to the question of incompetence, Pickus points out that EC 6-1 states a lawyer shall "accept employment only in matters which he is or intends to become competent to handle" and that EC 6-3 states an attorney may "accept . . . employment if in good faith he expects to become qualified through study and investigation, as long as such preparation would not result in unreasonable delay or expense to [the] client."

Concerning inadequate preparation and neglect, Pickus submits that the "prevailing standard" was enunciated in ABA Comm. on Ethics and Professional Responsibility, Informal Op. 1273 (1973):

Neglect involves indifference and a consistent failure to carry out the obligations which the lawyer has assumed to his client or a conscious disregard for the responsibility owed to the client. The concept of ordinary negligence is different. Neglect usually involves more than a single act or omission. Neglect cannot be found if the acts or omissions complained of were inadvertent or the result of an error of judgment made in good faith.

Pickus then argues that he had every reason to believe he would be competent to handle the transactions in question or, if he doubted his own ability, he had "a basis for a good faith belief that he would become competent to handle them." Under the good faith provision of EC 6-3, Pickus says, he "could not have known that he was not competent to handle the transactions."

Pickus also argues there was no evidence that he was inadequately prepared or that he gave inadequate attention to the transactions. To the contrary, Pickus states, "this is a situation in which [his] acts were 'inadvertent [and] the result of an error of judgment made in good faith.'" Further, concerning neglect, Pickus maintains "there was no harm to the client (Davis) because of Pickus' conduct; Davis actually received adequate services within a short time frame and without undue expense."

We do not agree with Pickus. We think the record of this case provides clear proof that he was not competent or prepared to handle the transactions in question and that he knew he was inad-

equate in these respects. We also think the record amply establishes Pickus' neglect of legal matters entrusted to him.

The previous recitation in this opinion of the way Pickus handled the transactions in question should be proof enough, by itself, of Pickus' lack of competence and preparation. But there is more.

It is true that Pickus was inexperienced; these were his first real estate closings, except for one in which he "assisted."[2] We would have thought, however, that even an inexperienced attorney would know not to release escrowed funds to a client before the conditions of escrow are satisfied. Yet, Pickus admitted in his testimony he "didn't know" it was his "responsibility" to make sure the lending institutions whose loans he closed were placed "in first position," and he acknowledged he turned the loan proceeds over to Davis "out of naivety" because he "did not know any better at the time."

Pickus obviously recognized his own inadequacies. He found it necessary to seek the advice of his own client and the latter's secretary on how to handle the transactions. Pickus admitted that Davis "knew much more" about real estate transactions than Pickus, "although [Pickus was] the lawyer." Pickus also sought the assistance of a loan officer of one of the lending institutions because he, Pickus, "didn't have the experience and [the loan officer] knew it."

Unfortunately, Pickus did not learn from experience; he handled the last of the transactions as poorly as the first. Even more unfortunate was Pickus' failure to associate an experienced attorney to assist him in handling the transactions.

Concerning the question of neglect, Pickus argues that since "there was no harm to the client (Davis) because of Pickus' conduct," no violation of DR 6-101(A)(3) occurred. Pickus apparently reads DR 6-101(A)(3) to apply only to matters entrusted to a lawyer by a client.

■ The language of DR 6-101(A)(3), however, encompasses neglect of legal matters entrusted to a lawyer, whether entrusted by a client or a third party.[3] Here, the lending institutions en-

---

[2] Both Pickus and Davis mentioned in their testimony another transaction, one Pickus handled for Davis' mother. We do not know, however, whether the transaction involved the satisfaction and release of prior liens. Davis described the transaction as one "regarding an estate."

[3] As we hold *infra*, the lending institutions were also clients of Pickus in the sense that he represented all the parties to the loan closings.

trusted legal matters to Pickus, within the meaning of DR 6-101(A)(3), when they delivered the loan proceeds to him with directions to satisfy prior liens and to obtain mortgagee title insurance policies insuring that the new loans constituted first liens.

With DR 6-101(A)(3) made applicable to the transactions in question, there hardly seems any basis for argument that Pickus did not neglect the matters entrusted to him by the lending institutions. He not only failed to satisfy the prior liens in all three cases but also failed in one instance to obtain title insurance. Neglect, according to ABA Informal Op. 1273, *supra*, "involves indifference and a consistent failure to carry out the obligations which the lawyer has assumed to his client or a conscious disregard for the responsibility owed to the client."[4] We think this definition describes Pickus' actions with complete accuracy.

### *The Alleged Violation of DR 9-102(A) and (B)*

These Disciplinary Rules provided:

*DR 9-102 Preserving Identity of Funds and Property of a Client.*
  (A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:
    (1) Funds reasonably sufficient to pay bank charges may be deposited therein.
    (2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in

---

[4] Because neglect may consist of a *conscious* disregard of responsibility, we reject Pickus' argument that it would be inconsistent to find he violated both DR 1-102 and DR 6-101 since, he says, "a violation of D.R. 1-102 properly is based upon a finding of *knowledge* (i.e., deliberate or intentional fraudulent action) and a violation of D.R. 6-101 rests upon a determination of *ignorance* (i.e., incompetence or neglect)." While neglect may result from ignorance, it may also be the product of deliberate or intentional action, *i.e.*, *conscious* action.

which event the disputed portion shall not be withdrawn until the dispute is finally resolved.

(B) A lawyer shall:

(1) Promptly notify a client of the receipt of his funds, securities, or other properties.

(2) Identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable.

(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.

(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.

216 Va. at 1130.

Pickus argues that the purpose of DR 9-102 is "both to protect the client and to avoid any appearance of impropriety by an attorney in regard to the client's funds." The focus, Pickus says, is "on the Attorney-Client relationship," and, thus, DR 9-102 is not "a proper mechanism by which to address complaints that third parties may have against Pickus since that Rule was not promulgated for the protection of third parties."

We disagree with Pickus. We think DR 9-102 was promulgated to protect third parties as well as clients. Indeed, the Comment to DR 9-102, appearing in ABA, *Annotated Code of Professional Responsibility* 441 (1979), states that "DR 9-102 sets forth rules to govern the attorney's handling of moneys and other properties on behalf of clients or *third parties.*"[5] (Emphasis added.)

We do not rest our decision on this ground alone, however. In our opinion, the lending institutions involved in this case were more than third parties in their relationship with Pickus. The institutions were not represented by their own attorneys, so Pickus

---

[5] Citing *In re Rabb*, 73 N.J. 272, 374 A.2d 461 (1977), Pickus says the reference to third parties in the ABA Comment "relates to situations in which the lawyer has acquired funds for the client 'to pay over to others on the client's behalf.' " This does not mean that the reference may not also relate to other situations.

acted alone in closing the loans in question. When a lawyer acts as a closing or settlement attorney and no other lawyer is involved, the closing or settlement attorney represents all the parties and, in this limited sense, all the parties are his clients.

In such a situation, the settlement attorney assumes the duties of a fiduciary and must properly handle and dispose of any funds not his own which he may receive in connection with the settlement. And we think DR 9-102(A) and (B) set forth the rules governing the proper handling and disposition of such funds. Hence, we believe the Board correctly found that Pickus had violated DR 9-102(A) and (B).[6]

### Propriety of Suspension

Pickus argues that the suspension of his license to practice law was not justified by the evidence before the Board. He has already paid "handsomely" for his "mistake," Pickus says, and he has instituted procedures in his office to insure that deeds of trust will "always be satisfied upon receipt of loan proceeds." The suspension of his license under these circumstances, Pickus asserts, was "a clear abuse of the Board's power."

The determination of a proper sanction was a matter within the discretion of the Board. *Gibbs*, 232 Va. at 42, 348 S.E.2d at 211; *Blue* v. *Seventh District Committee*, 220 Va. 1056, 1062, 265 S.E.2d 753, 757 (1980). The sanction imposed was within permissible limits, and nothing in the record suggests the Board abused its discretion.

We will affirm the Board's order suspending Pickus' license to practice law in this Commonwealth for a period of one year, with the suspension to commence November 1, 1986. Pickus shall give notice, by certified mail, of his suspension to all clients for whom he is currently handling matters and to all opposing attorneys and presiding judges in pending litigation. Pickus shall further make immediate appropriate arrangements for the disposition of those matters presently in his care in conformity with the wishes of his clients.

*Affirmed.*

---

[6] Pickus does not argue that the way he handled the funds in question conformed to the requirements of DR 9-102(A) and (B).