IN THE MATTER OF ALAN R. KATZ, AN ATTORNEY AT LAW.

Argued May 4, 1982—Decided July 16, 1982.

*Robyn M. Hill* argued the cause for complainant Disciplinary Review Board (*Colette A. Coolbaugh*, Secretary, attorney).

*Kenneth J. Fost* argued the cause for respondent.

PER CURIAM.

This matter arises from two reports and recommendations of the Disciplinary Review Board. The first report, entered in 1979, involved five complaints of misconduct and a charge of overall inadequate record keeping, and recommended an indefinite suspension from individual private practice, but permitted a supervised practice upon return. The second, entered in 1982, involved two new matters of ethical misconduct and recommended disbarment. We agree that the circumstances now call for disbarment.

In 1974 and 1975, three complaints were filed against the respondent by complainants Marano, Woomer and Wrede, alleging failures to start suit, misrepresentation of the status of matters, and untimely handling of trust funds. Katz failed to cooperate with the Morris County Ethics Committee by refusing to produce his ledger books and financial records. This Court entered an order of temporary suspension on June 13, 1975. On January 19, 1977, following a hearing and payment to Wrede of $1,000, the temporary suspension was lifted and the respondent was restored to practice, pending final disposition of the matter.

In the spring of 1978, two new complaints were filed by Moore and Gagliardi, charging respondent with misconduct involving down payments made to the respondent's home construction corporations. Respondent failed to answer the complaints and was again temporarily suspended from June 7 to 13 of 1978.

Presentments were filed by District X on the Wrede, Woomer and Marano matters, and by District VII on the Moore and Gagliardi matters.

In the fall of 1979, the Disciplinary Review Board [1] filed a decision and recommendation that Katz be barred from the private practice of law through his own firm, but that he be allowed to engage in the practice of law as an employee of a public body or private law firm. One consideration was the respondent's willingness to cooperate and stipulate to the facts, given that three of the complainants had moved out of New Jersey.[2] This report covered the Marano, Woomer and Wrede complaints, the record keeping violation, and the Gagliardi and

---

[1] R. 1:20, effective April 1, 1978, created the Disciplinary Review Board, including lay members, to review actions taken by the local, or district, committees.

[2] The Committee need not close an investigation merely because of the physical absence of an otherwise available witness. R. 1:20–2(l)(2) grants both parties the right to prehearing discovery pursuant to Disciplinary Review Board regulations. To the extent possible, with leave of the Board, such discovery could include depositions of absent witnesses.

Moore complaints, and found violations of DR1–102(A)(4) and (6) and DR9–102.

In early December 1979, before it could act on that report, the Court was advised of four more pending complaints involving, among others, the Hersh and Porphy matters. The Court entered an order on January 9, 1980 deferring action on the pending Disciplinary Review Board report and temporarily suspending respondent. The remaining complaints were processed through the District VII Committee and the Disciplinary Review Board.

In February 1982, the Disciplinary Review Board issued a second report and recommendation incorporating its prior conclusions and recommending that respondent be disbarred.

The misconduct that forms the basis of the recommendations can be summarized as follows:

## A. *The Marano Matter*

In October 1971, the respondent was retained by Mr. Marano with regard to an insurance claim. Between October 1971 and the spring of 1975, Mr. Marano inquired frequently as to the status of his case. Respondent repeatedly assured Mr. Marano that the matter was under control, advising him alternatively that the matter would come to trial in the near future or that a trial date had recently been postponed. Each answer implied that a lawsuit had, in fact, been filed and was pending but simply had not yet come to trial. The truth was that no suit was ever filed by respondent. Mr. Marano obtained other counsel and suit was timely filed.

## B. *The Woomer Matter*

Respondent had represented complainant and his wife in various matters prior to Mrs. Woomer's request that he represent her in a municipal court case involving an allegation of defrauding a creditor. Although respondent did not agree to represent Mrs. Woomer in the municipal court matter, he did agree to help her by contacting the complaining witness and

settling the underlying financial claim. Respondent advised the Woomers that he had settled the fraud claim with the creditor and that the criminal action would be dismissed. Neither had, in fact, happened and Mrs. Woomer was arrested. To remedy the matter, respondent paid the creditor $1,000 from his trust account and the criminal complaint was dismissed. The settlement monies, however, had not come from Mrs. Woomer. Accordingly, the Disciplinary Review Board concluded that the $1,000 had to have come from respondent's deposit of personal funds in his trust account or from the trust funds of another client.

In another aspect of the Woomer complaint, Mr. Woomer, a beneficiary of an estate being handled by the respondent, charged that respondent, after pressure from another beneficiary, paid the beneficiary $3,000 (believed by respondent to be slightly less than the amount of the ultimate distributive share) prior to final resolution of the estate. The trust funds held for the estate at this time amounted to only $1,000. Again, the money must have come from the respondent's personal funds or his clients' trust funds, which were commingled.

The final aspect of the complaint objected to the respondent's failure to render an itemized legal bill. The bill rendered said only "legal fees from year 1965 to date, $1,000." The Disciplinary Review Board made no specific finding on this aspect and we do not take it into account in our disposition.

## C. The Wrede Matter

In the fall of 1971, complainant retained the respondent to handle an uncontested divorce. The matter soon became contested. Final judgment was not entered until the spring of 1973. During the course of litigation, the marital home was sold, and since the complainant had moved to California, respondent was to handle the receipt and disbursement of the proceeds of sale. $6,000 of the proceeds were disbursed at the time of closing but it was not until the spring of 1974, after inquiries by Mrs. Wrede's relatives, that respondent reviewed his files and

determined that an additional $6,578.26 was owed to the client. Respondent's trust account was overdrawn on the day of the check's presentment. Respondent later determined that his earlier calculations were incorrect and that another $720 was due to the client. Only after the committee investigator prodded the respondent did he issue a replacement check for $6,578.26 and a second for $720.

### D. *Record Keeping Violations*

The Board determined that the record keeping for respondent's trust accounts, involving two separate accounts, was wholly inadequate. Respondent deposited not only trust account funds but also personal investment assets of his own and funds of others, including a construction company, into the accounts. Although separate ledger cards were maintained for the construction company transactions, the Board could not adequately trace the receipts and disbursements since there was no master account sheet combining all of the transactions. The Board also found that for periods of time ranging from days to several weeks, respondent's trust account had insufficient funds to cover the obligations to clients. Often one or another of respondent's trust accounts was overdrawn, the respondent remedying this matter by making a deposit of personal funds.

### E. *The Gagliardi Matter*

This matter concerned a business transaction between Mr. and Mrs. Gagliardi, newlyweds, and S. J. A. Builders, Inc., a corporation for which respondent served as president and which he owned. In April 1977, the Gagliardis executed a contract which required the corporation to construct a new home for them on property in Clinton Township. The Gagliardis trusted the respondent and dealt with him personally with regard to the contract and construction of the home. Their visits to the building site, however, revealed that work was not being completed as contracted. They received many excuses from the respondent, not including the fact that he had never received a building permit for the premises. Finally in November 1977 they demanded the

return of their down payment. The first check that they received failed to clear due to insufficient funds. To rectify this situation, respondent issued a check for over $6,000 drawn on his attorney's trust account. This check was also returned for insufficient funds. Respondent admitted that at the time he issued the trust account check he had approximately $15 in the account.

### F. *The Moore Matter*

This matter is very similar to the Gagliardis'. These prospective purchasers signed a contract with Adam Construction Company, of which respondent was the president, which required the corporation to construct a new home for the Moores in the Borough of Hampton. The corporation was, in fact, a non-existent corporation, described by the respondent as a *de jure* corporation.

When the house was not completed within the required closing time, a demand was made for return of the $1,000 deposit. A post-dated check for $1,000 was issued on the Adam Construction Company account but was returned "account closed." Respondent subsequently paid the $1,000 in full.

### G. *The Hersh Matter*

Beginning in 1970, the respondent represented Mr. and Mrs. Hersh over a number of years in a variety of cases. In addition to the attorney-client relationship, a friendship developed. On November 23, 1977, the respondent represented Mr. and Mrs. Hersh in the purchase of a new home in Rockaway, New Jersey. The circumstances surrounding this closing have become the focus of controversy concerning the proper discipline to be visited upon this respondent. The Disciplinary Review Board concluded that the respondent had received approximately $2,000 for the payment of a tax liability to Rockaway municipality, and additional funds to pay a title insurance premium of $236.38. Respondent never paid the title insurance premium. In addition, the respondent made no attempt to make the necessary payment to the municipality for taxes until January

30, 1978, more than two months after the alleged receipt of funds at the closing. In January, two checks were drawn on his trust account, one for $1,530.72 and a second for $562.46. Both of these checks were returned for insufficient funds. On February 24, 1978, the check for $562.46 was renegotiated and cleared. The larger amount was not paid until March 2, 1978 at which time respondent obtained a certified check in the amount due, payable to Rockaway Borough. The respondent strongly challenges the conclusion that either of these occasions involves a misappropriation of funds on the grounds that his friendship with the Hershes had induced him to loan them over $20,000 to make the closing possible, and that he had never been adequately reimbursed.

During the summer of 1977, the Hershes, who then owned a home in Lake Tranquility, became interested in purchasing the home in Rockaway, New Jersey. They had not as yet, however, sold their home in Lake Tranquility. Respondent allegedly cautioned the Hershes about committing themselves to purchasing the Rockaway home without having a firm deal on the sale of the Lake Tranquility property and maintains that the Hershes were willing to take the chances. It is also asserted that the seller of the Rockaway property agreed orally with Mr. Hersh to make the closing date on the new property contingent on the prior closing of the Lake Tranquility home, but that he would not put this in writing. The documents do not reflect such an agreement. The contract of sale for the Rockaway home stipulated a purchase price of $71,000 and a closing date of October 15, 1977. An initial $1,000 deposit was required toward the purchase price. An additional deposit of $6100 was to be paid on October 15, 1977 if closing had not taken place by such date. The Hershes paid the $1,000 but failed to close on October 15 or to make the $6100 payment. According to respondent, the Hershes were unable to come up with the cash for the additional deposit. Hoping to gain enough time to have the Lake Tranquility closing first, the respondent allegedly kept putting off the sellers of the Rockaway house until they made time of the

essence. The sellers agreed to wait no longer than November 23, 1977. Although the mortgage was not ready for closing on that date, the parties appear to have consented to closing in escrow then, the sellers holding their proceed checks until the mortgage closed two days later.

Thus, there is no evidence that when the Hershes came to the closing, they delivered any funds whatsoever to the respondent. Respondent testified that he obtained a loan in excess of $20,000 to make the closing possible.

In round numbers, the transaction involved a $71,000 purchase price of the Rockaway home with a $1,000 deposit and first mortgage of $49,700. After adjustments, the cash due from purchaser at closing was $20,804. This balance was advanced by respondent. As noted, he closed the fee transaction on Wednesday, November 23, 1977 and the mortgage transaction on November 25, 1977. There was obviously a shortfall close to $21,000, presumably not including the tax liability, the insurance payment, or other costs. The Hershes admitted that Katz made up the shortfall. They testified that Katz kept reassuring them that he would find the solution to the matter. In retrospect, it would have been in Katz' best interest to refuse to proceed with the closing.

The Lake Tranquility closing took place a week after the Rockaway closing. The net proceeds of the sale of the Lake Tranquility property were $15,534. Hersh testified that he gave Katz an additional $4,000 by check and $2,000 by cash, while Katz contends that he received only $5,000 by check and approximately $15,000 from the proceeds of the closing for a total of $20,000.67. This amount still falls short of the almost $23,000 needed properly to close the transaction. On this basis, the respondent adamantly contests the Disciplinary Review Board's finding that he received funds for payment of the $2,000 tax liability and the title insurance.

In our view, we need not strain to analyze the respondent's tortured bookkeeping. Once the respondent had placed his

attorney's imprimature upon the closing statements at the time of the Rockaway closing, the source of the funds was irrelevant. By submitting the loan closing and RESPA statements, he represented to the lending institution and to supervising government officials that there were sufficient funds to close the transaction. The statements covered the buyers' allowance of a credit of $1,807.49 for past due taxes, payment of one quarter's taxes and the fee policy premium of $236.38. The only value to respondent in persuading us that he had never received sufficient funds to make up the shortfall would be if the outcome of this aspect of his case depended upon a *Wilson* analysis that he had in fact misappropriated clients' funds. *See In re Wilson*, 81 *N.J.* 451 (1979). Because of the disposition we make of this matter, we do not find it necessary to predicate disciplinary action upon a *Wilson* violation. Suffice it to say, once the lawyer personally offered to advance the funds to his clients to facilitate the closing, he was dutybound thereafter to protect his clients' interest to the fullest extent. That would obviously require prompt payment of the municipal taxes that were a lien on the property and the acquisition of the fee title policy.

## H. *The Porphy Matter*

The Board found that respondent was negligent in handling Mrs. Porphy's matter and that he deceived her about its status. Katz denied these allegations. Although served with a subpoena, Mrs. Porphy never appeared to testify in person at the hearing.[3] Thus, when considering this matter, it must be remembered that there was no evidence submitted against respondent other than the committee's complaint, that was not signed by the complainant. Nonetheless, the Disciplinary Review Board made findings with respect to this case, certain of which are substantiated by the respondent's own admissions.

---

[3] *R.* 1:20–2(p) grants the District Ethics Committees the power to issue subpoenas to testify and subpoenas duces tecum and authorizes enforcement "by the Superior Court in the manner provided by *R.* 1:9–6 in the case of a subpoena of a public officer or agency." There should be no hesitancy to seek such relief from a court.

Mrs. Porphy retained the respondent to represent her in a matrimonial matter and signed a complaint drafted by him in July 1978. Respondent has admitted that he did not file and serve the complaint until January 1979, although he told Mrs. Porphy that it was filed and awaiting service in the sheriff's office. Moreover, he failed until March of 1979 to advise her of a settlement offer made in January of that year. Although he advised his client over a number of months that her case would imminently be scheduled for a court date, he had, in fact, never forwarded the amended settlement papers to her husband nor paid the $60 hearing fee. Mrs. Porphy retained another attorney and had some difficulty obtaining the file from respondent. On these admissions, the Board found that the respondent misrepresented the status of the complaint, and advised her that hearing dates had been scheduled when in fact the required $60 hearing fee was never paid by the respondent.

The respondent urges that he had known Dianne Porphy and her husband for quite a few years. He was deeply concerned about the fact that Mrs. Porphy had agreed to surrender custody of their eight-year-old daughter to her husband, whom he considered to be a violent person. He concedes that his failure to carry out the proposed settlement of the matter was based upon his own personal judgment about what was in Mrs. Porphy's best interest. He alleges that forwarding the proposed amendment concerning Mrs. Porphy's daughter and paying the $60 hearing fee would have hastened the final divorce and given Mrs. Porphy no time to reflect. Forced to choose between the evil of delaying his client's case and the evil of letting his client make a precipitous decision potentially involving disastrous results for both the client and the child, he claims to have made the better choice both legally and ethically.

The Board concluded that the respondent violated DR6–101 and 9–102, failed to carry out his contracts of employment thereby prejudicing his clients in violation of DR7–101(A)(2) and (3), made misrepresentations to Mrs. Porphy, and dishonestly used the Hershes' trust funds in violation of DR1–102(A)(4).

We need not wrestle with the weight to be given to Mrs. Porphy's allegations to conclude that the respondent engaged in unprofessional conduct by placing his own personal viewpoint above that of his client. He never counselled nor informed his client of his concerns. The respondent had the option of removing himself from the case or moving before the court to obtain the necessary protection for the child and simultaneously for himself. The fact that he felt confronted by a moral dilemma because of his personal judgment that she was acting unwisely in seeking to expedite the termination of her marriage does not excuse his conduct. That his client's desires conflicted with his personal opinion of her best interests is not a valid defense here. His failure zealously to represent her violated DR7–101(A)(1), (2) and (3). *In re Rosenthal*, 90 *N.J.* 12 (1982).

Upon a review of the Hersh and Porphy matters and in consideration of the respondent's prior disciplinary history, the Disciplinary Review Board recommended that the respondent be disbarred. The respondent has strongly urged that in view of the Disciplinary Review Board's earlier recommendation of lenience, we should be precluded from imposing any greater penalty because, in the respondent's judgment, no clear and convincing proof of new disciplinary violations has been set forth justifying disbarment. We disagree. There is clear and convincing evidence of new misconduct. We cannot help but conclude that the respondent has totally failed to heed the warnings given him heretofore in the disciplinary actions. As noted in our recital of the procedural history, respondent kept totally inadequate records. That has not changed. His conduct in the Hersh matter is totally inconsistent with an understanding of the responsibilities of practice. Similarly, he continued to fail to file complaints, to misrepresent the status of cases to his clients, to fail to zealously represent his clients' interests, to issue bad checks, and to misuse his trust accounts. Although the Disciplinary Review Board was willing to recommend that the respondent be permitted eventually to practice in a structured environment as an employee of a public body or a private

law firm, it has disavowed that conclusion and we agree that it must be disavowed.

Upon an independent review of the record, the Court is satisfied that the respondent has been proven guilty of unethical conduct in these matters by clear and convincing proof.

In the Marano, Woomer, Hersh and Porphy matters, he violated not only DR6–101 by failing to act competently in the handling of the matters and by not pursuing the clients' claims diligently, but also DR7–101(A)(2) and (3) by failing to carry out his contracts of employment and by prejudicing his clients.

In the Woomer, Wrede, Gagliardi and Hersh matters, instruments were drawn on his trust account without available client balances. He clearly violated DR9–102(A) by consistently failing to preserve the identity of funds and property of his clients and mingling his personal and business funds with those of his clients.

In the Wrede matter, he violated DR9–102(B)(4) by failing to pay over promptly funds that the client was entitled to receive.

In the Gagliardi and Moore matters, the conduct of his business affairs involved misrepresentation and deceit in violation of DR1–102(A)(4) and (6). "An attorney must act in his business transactions with high standards and his professional obligation reaches all persons who have reason to rely on him even though not strictly clients." *In re Lambert*, 79 *N.J.* 74, 77 (1979).

In the Marano, Woomer and Porphy matters, the respondent misrepresented the status of pending cases. It is unethical to advise a client of facts that the attorney knows are incorrect. *In re Lanza*, 24 *N.J.* 191, 196 (1957).

Taken together, respondent's conduct reflects a lack of awareness of the degree of professionalism expected of every member of the bar. Respondent implores us that we not disbar him, citing instances where suspensions have been imposed. But those cases have involved episodes brief in duration and not reflecting such a pervasive pattern of misconduct. Thus, in

*Matter of Getchius*, 88 *N.J.* 269 (1982), a case involving six different ethics complaints and numerous violations, including misrepresentation to clients, delays in institution of suits, failure to advise clients of the status of their cases, failure to act competently, and deceitful communications, we imposed only a two-year suspension with a requirement of medical proof of fitness to practice prior to return. That case is distinguishable on two grounds. Getchius had suffered from physical and psychological ailments during the two-year period of violations, and his conduct did not involve the inadequate handling of trust funds. *In re Barrett*, 88 *N.J.* 450 (1982), involved five matters of misconduct. However, again, the case did not involve trust fund mishandling or the wholesale lack of professionalism manifest in this record. In *In re Brown*, 88 *N.J.* 443 (1982), the attorney was disbarred for conduct similar to that here, i.e., issuing bad checks, misusing clients' funds, neglecting clients, misrepresenting facts to clients, but most importantly, misappropriating clients' funds. It may well be that the reason misappropriation of funds is not proved here is because the respondent's records are so totally inadequate that it is impossible to document such a charge one way or the other. Respondent here repeatedly issued bad checks, conduct that is a disorderly persons offense under *N.J.S.A.* 2C:21–5. Much more serious, however, is his flagrant violation of the responsibility to segregate his clients' funds from his own pursuant to DR9–102(A).

Respondent's counsel has ably and forcefully argued his cause and we are entreated to consider the respected position once held by the respondent in his community. However, upon consideration of all the circumstances, we are constrained to conclude that respondent must be disbarred.

We further direct the respondent to reimburse the Administrative Office of the Courts for costs including the cost of production of the transcripts.

Respondent's name will be stricken from the roll.

286

*For disbarment*—Chief Justice WILENTZ and Justices PASHMAN, CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—7.

*Opposed*—None.

### ORDER

It is ORDERED that ALAN R. KATZ of Basking Ridge be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that ALAN R. KATZ be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that respondent comply with all the regulations of the Disciplinary Review Board governing suspended, disbarred or resigned attorneys.