IN THE MATTER OF HAROLD L. MARKS, AN ATTORNEY AT LAW.

April 13, 1984.

## ORDER

This matter having come before the Court on an order to show cause why HAROLD L. MARKS of ENGLEWOOD should not be disbarred or otherwise disciplined for his violation of *DR.* 9–102, and good cause appearing;

It is ORDERED that the Report of the Disciplinary Review Board recommending that respondent be disbarred is hereby adopted; and it is further

ORDERED that HAROLD L. MARKS be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately; and it is further

ORDERED that HAROLD L. MARKS be and hereby is permanently restrained and enjoined from practicing law; and it is further

ORDERED that HAROLD L. MARKS comply with Administrative Guideline No. 23 of the Office of Attorney Ethics regarding suspended, disbarred or resigned attorneys; and it is further

ORDERED that HAROLD L. MARKS reimburse the Office of Attorney Ethics for appropriate administrative costs.

Decision and Recommendation of the Disciplinary
Review Board

To the Honorable Chief Justice and Associate Justices of the Supreme Court of New Jersey:

This matter is before the Board based upon a presentment filed by the District II Ethics Committee which concerns the misappropriation of nearly $50,000 in trust funds by the respondent.

The respondent represented Frances Tuber (formerly Frances Brauer) in the sale of her home in Englewood Cliffs, New Jersey. At closing, Ms. Tuber took back a mortgage from the purchasers. Thereafter, Ms. Tuber moved to 5203 Banyon Lane, Tamarac, Florida 33319.

In the summer of 1981, the purchasers determined to pay off the mortgage held by Ms. Tuber. The respondent continued to represent Ms. Tuber in this matter, and prepared a satisfaction and discharge of the mortgage which was signed by Ms. Tuber. A trust account check for $62,200 dated July 7, 1981 and payable to "Harold Marks Trust Account—Frances Brauer" was forwarded to respondent by the purchasers' attorney in satisfaction of this mortgage. On July 8, 1981, the respondent deposited the $62,200 in his attorney trust account. Approximately three weeks later, the respondent enclosed his trust account check number 4437, payable to Frances Tuber in the amount of $62,200, in an envelope addressed to Frances Tuber at 5203 Banyon Lane, Newark, New Jersey 07631. Although the street

address was correct, the remainder of the address was erroneous. The envelope containing the check was later returned to respondent, who then forwarded the check to Ms. Tuber in Florida. Since the respondent had failed to sign the check, as maker, Ms. Tuber was unable to deposit it. Ms. Tuber then called the respondent, who advised her that he would forward another signed check to her. Some time thereafter, Ms. Tuber received trust account check number 4444 dated August 19, 1981 in the amount of $62,200. She deposited that check, which was then returned for insufficient funds. When Ms. Tuber telephoned respondent for an explanation, he advised that a substantial deposit made by him to his trust account had failed to clear, and her funds were therefore utilized to satisfy other checks which cleared the bank earlier than hers. Respondent's bank statements show that the $62,200 check was first returned for insufficient funds on August 25, 1983. That check was resubmitted on September 4th to respondent's bank and was again returned for insufficient funds on September 8th. Respondent's trust account contained only about $7,000 during that period.

On September 21, 1981, Ms. Tuber's son, Theodore R. Brauer, met with the respondent. The respondent initially gave Mr. Brauer the same story he had given Ms. Tuber. When pressed for verification, he confessed to Mr. Brauer that he had utilized the funds to pay off personal debts.

The respondent's misappropriation of Ms. Tuber's funds resulted in his temporary suspension from the practice of law on January 12, 1982. Thereafter, an accountant was retained by the Division of Ethics and Professional Services to review respondent's books and records.

The accountant, Robert Kroll, noted that in light of the absence of a client trust ledger and the limited availability of records only "limited conclusive evidence" was available. The records forwarded by the accountant show that by August 14, 1981, respondent's trust account contained only $14,001.30, rath-

er than the $62,200 in Tuber funds. At that point he was therefore out of trust by more than $48,000. On August 21, 1981, the respondent's trust account was charged for certified check number 4447 in the amount of $13,500, payable to Frances Tuber. The record does not indicate the date of receipt, although it appears that Ms. Tuber had not received that money as of the time her son spoke with the respondent on September 21st. Respondent thereafter repaid to Ms. Tuber an additional $30,500 in three separate checks, for a total of $44,000. These payments were made between mid-September and the end of October 1981. On June 16, 1982, the Clients' Security Fund granted Ms. Tuber's claim for the remaining balance due her of $18,200.

At hearing before the District II Ethics Committee, the respondent admitted to the charge of failure to maintain his attorney records in accordance with R. 1:21–6. The respondent further admitted to misappropriation of the bulk of the Tuber funds. He stated that the funds were used to pay his regular business and living expenses, including extensive loan payments. He further testified that his misuse of the Tuber funds was not unique, in that he began to utilize other client funds for payment of expenses at least as early as 1978 or 1979. T. 72:20. Thus, when the Tuber funds came into his trust account, they were also utilized to pay other trust account obligations to other clients. T. 69:24, T. 78:4. These other trust account obligations amounted to approximately $35,000. T. 98:22. This amount apparently included client trust funds utilized by respondent to satisfy in part a malpractice claim. T. 99:14.

The respondent also testified as to his personal financial position, which deteriorated significantly between 1965 and 1981. In 1965, the respondent and his first wife were divorced. The respondent indicated that the divorce settlement was very much in his wife's favor, and that she kept their house and "whatever I had really". T. 46:4. Additionally, he paid $100 per week to his ex-wife for the support of his son, who was then about 11 years old. In 1968, the respondent remarried and

assumed the responsibility for support of his second wife's two children who were then aged 4 and 9. He and his current wife had another child who is now 13.

In the mid-1970's, the respondent's partnership with several other attorneys was dissolved. During the same time period, his practice, which consisted primarily of real estate matters, began to suffer because of a decline in the real estate market. His income fell from a high of $30,000 annually to $4,000 in 1978, $17,000 in 1979 and $2,027 in 1980. With his wife's income from employment their combined income in 1980 was $13,388, and about $18,000 in 1981. Although he filed his tax returns during this period he had no money to pay the taxes due for several years, and he currently owes the Internal Revenue Service about $20,000. Additionally, because of his financial condition, the respondent found it necessary beginning in about 1975 to borrow money from banks and family members to make ends meet. He subsequently found it necessary to refinance frequently in order to continue monthly payments and meet new personal obligations. Although he considered himself bankrupt, he did not declare bankruptcy but continued to attempt to meet his obligations.

He managed to pay Ms. Tuber the $44,000 due to a $25,000 loan from a friend and an additional loan for which the same friend cosigned.

At hearing before the District II Ethics Committee, 12 character witnesses appeared to testify on the respondent's behalf. A number of these witnesses were respected attorneys. All of these individuals testified as to respondent's reputation as a trustworthy and honest person.

The District II Ethics Committee concluded that the respondent violated *DR* 1–102(A)(3), (4) and (6) as well as *DR* 9–102(B)(3), and (4) and *DR* 9–102(C) with regard to his handling of the Tuber funds. The Committee further found that the respondent failed to keep proper attorney records in violation of *R.* 1:21–6 and *DR* 9–102(C). The Committee noted several

mitigating factors relating to personal and economic problems as well as his cooperation in the proceedings. While acknowledging that disbarment would normally be mandated, the Committee nevertheless recommended that the penalty be something less in this case.

At hearing before the Board, the Committee reiterated its position. Respondent's counsel argued that the mandate of disbarment stated in *In re Wilson* should not be applied here, since the client trust funds were "not used for any purpose outside of paying other debts and in paying the bare expenses of Mr. Marks".

The respondent advised the Board that he was "under terrific pressure" at the time he misappropriated the Tuber funds because of his financial circumstances. Although he apparently realized that he was doing wrong at the time he took the money, he stated that "... it was a compulsion: I had to live, my family had to live and that's all I could think about". DRB T. 23:25–24:2. He intends to repay the Clients' Security Fund for the Tuber claim, but has only been able to pay a little over $1,000 thus far.

## CONCLUSION AND RECOMMENDATION

Upon a review of the full record, the Board is satisfied that the conclusions of the Committee in finding the respondent guilty of unethical conduct are fully supported by clear and convincing evidence. However, the Board does not adopt the Committee's recommendation for continued suspension rather than disbarment. The respondent has admitted to the intentional misappropriation of nearly $50,000 in obvious violation of *DR* 9–102. This alone merits disbarment under *In re Wilson*, 81 *N.J.* 451 (1979). Moreover, by respondent's own admission, he had, for several years, utilized client funds to pay off other client obligations, thereby engaging in "(t)he ancient scheme of robbing Peter to pay Paul", *In re Wittreich,* 5 *N.J.* 79, 88 (1950). Additionally, since 1978, the respondent has failed to keep the

required attorney records. *R.* 1:21–6, *DR* 9–102. Thus, rather than an isolated and aberrational incident, a pattern of improper conduct has been established.

The Board is cognizant of the respondent's apparent good reputation in his community and among fellow lawyers, as well as his attempts to make full restitution. These factors were termed "unpersuasive" by the Court in *Wilson, supra* 81 *N.J.* at 459, 460. Similarly, the Board has reviewed respondent's statement that his improper actions were taken in response to severe financial pressure which led him to act in an irrational fashion to provide for the basic support of himself and his family.

This situation was specifically considered by the *Wilson* Court at 460:

"... An attorney, beset by financial problems, may steal to save his family, his children, his wife or his home. After the fact, he may conduct so exemplary a life as to prove beyond doubt that he is as well equipped to serve the public as any judge sitting in any court. To disbar despite the circumstances that led to the misappropriation, and despite the possibility that such reformation may occur is so terribly harsh as to require the most compelling reasons to justify it. As far as we are concerned, the only reason that disbarment might be necessary is that any other result risks something even more important, the continued confidence of the public · in the integrity of the bar and the judiciary."

The Board considers this to be such a situation, and recommends that the respondent be disbarred. The Board further recommends that the respondent be required to· reimburse the Office of Attorney Ethics for appropriate administrative costs incurred.