IN THE MATTER OF EDWARD L. FLEISCHER, AN
ATTORNEY-AT-LAW.

IN THE MATTER OF H. BARRY SHULTZ, AN
ATTORNEY-AT-LAW.

IN THE MATTER OF JAY L. SCHWIMER, AN
ATTORNEY-AT-LAW.

Argued September 24, 1984—Decided May 28, 1986.

*David E. Johnson, Jr.,* Director, argued the cause for the Office of Attorney Ethics.

*Justin P. Walder* argued the cause for respondents (*Walder, Sondak, Berkeley & Brogan,* attorneys; *Justin P. Walder* and *Dominic J. Aprile* on the brief).

PER CURIAM.

These disciplinary proceedings involve three respondents, who constitute all the members of their former law firm. They are charged with various ethical infractions, most notably the misappropriation of clients' funds. Although one member of the firm, respondent Fleischer, was primarily responsible for

the firm's disbursements, all three respondents knew of and participated in the misappropriation.

After a hearing, the District IX Ethics Committee (Ethics Committee) returned a presentment, finding, among other things, that respondents had knowingly used clients' funds for their own benefit. Thereafter the Disciplinary Review Board (DRB) found overwhelming evidence that respondents had intentionally misappropriated clients' funds. Relying on *In re Wilson*, 81 *N.J.* 451 (1979), the DRB recommended disbarment of all three respondents. Our independent review of the record leads us to the same conclusion.

## I

As found by the DRB, the facts are:

When Respondents' law firm failed to pay an outstanding bill to an office supplier, the supplier filed a district court complaint on September 28, 1982 against the firm. The firm paid this bill by a trust account check for $503.24 dated December 21, 1982. The check was rejected because of insufficient funds. Respondent Fleischer told the attorney representing the creditor that his firm was having some problems with this bank account and promised that money had been set aside specifically for this bill. Respondent Fleischer requested the attorney to redeposit the check, which he did. This check, too, was returned for insufficient funds. Respondent Fleischer promised the bill would be paid immediately. However, the law firm took no action in making good on this check. The creditor's attorney on February 2, 1983 contacted the then Division of Ethics and Professional Services (DEPS). Respondents later paid this obligation through their personal funds.

DEPS filed a notice of motion on March 25, 1983 with this Board for Respondents' temporary suspension based on its auditor's report that the law firm was using its trust account to pay both trust and operating expense obligations. Moreover, the auditor found that the trust account had 24 instances of overdrafts between December 7, 1982 and January 31, 1983. This Board carried the matter so Respondents could have their trust account reconstructed by their own accountant. After reviewing additional accounting reports, this Board on June 15, 1983 denied the temporary suspension motion based on Respondents' representation that their accountant would continue to review their financial records.

On April 25, 1984, a five-count complaint was filed against Respondents by the Office of Attorney Ethics. The three respondents were charged with misuse of trust funds, commingling funds, and gross negligence (*Count One*); failure to properly account for clients' funds (*Count Two*), misappropriation of clients' funds, and failure to promptly remit clients' funds (*Count Three*);

being overdrawn on their trust account on numerous occasions (*Count Four*); and violation of their fiduciary and professional obligations, which placed their clients' funds in serious jeopardy, and gross negligence in handling clients' funds (*Count Five*). These acts of misconduct were alleged to have occurred between 1981 and 1983. Respondents filed an answer admitting they failed to keep the required books and records and commingling funds, but denied any misappropriation, claiming their conduct was inadvertent and unintentional. They further denied that they were grossly negligent, contending they had acted in good faith at all times. The matter was heard by the Ethics Committee on October 29, 1984. While finding that Respondents were candid and contrite, the Ethics Committee rejected their contention they did not know they utilized clients' funds for their own benefit.

## Based on these findings, the DRB concluded:

Upon a review of the full record, the Board is satisfied the conclusions of the District IX Ethics Committee in finding Respondents guilty of unethical conduct are fully supported by clear and convincing evidence.

The facts in this case are clear. As a result of a cash flow problem, Respondents commingled funds from their operating account into their clients' trust account. From this one account, they paid all obligations, office and client. Although each knew this practice was improper, they continued it.

These cases are clearly governed by *In re Wilson*, 81 *N.J.* 451 (1979), which defines misappropriation as

any unauthorized use by the lawyer of clients' funds entrusted to him, including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom. [*Id.* at 455, n. 1].

It is palpably evident Respondents created a revolving trust account by commingling all money received into one account so they would have sufficient funds to meet both their client and personal obligations. Respondents claimed they did not realize, at the time, their firm was using funds belonging to clients to operate the law firm. Poor accounting procedures, however, are no excuse for ignoring the obvious; clients' funds were being used. At the Committee hearing, Respondents acknowledged they had, in fact, used funds belonging to their clients because a number of the firm's checks had been returned for insufficient funds. These Respondents had under *Wilson, supra,* misappropriated clients' funds.

Respondents claimed they did not intentionally misappropriate these funds. The evidence to the contrary is overwhelming. The Board, therefore, finds Respondents intentionally misappropriated funds, *DR* 9-102. That no client suffered a loss is irrelevant and fortuitous. *In re Gavel*, 22 *N.J.* 248, 265 (1956).

*Wilson, supra,* created a presumption of disbarment unless extraordinary mitigating factors are shown. Respondents were contrite, cooperated fully with the ethics proceedings and had their accounting records brought up to standard. No clients were injured by Respondents' misconduct and none complained. These may be considered mitigating factors in other types of

offenses, but *Wilson, supra,* and its progeny have rejected them in misappropriation cases. See *Matter of Marks,* 96 *N.J.* 30 (1984). Even if considered in mitigation, they are greatly outweighed by other aggravating factors. These Respondents are experienced members of the Bar. Respondent Schultz [*sic*] was admitted in New Jersey in 1966 and in New York in 1965, Respondent Fleischer, 1969 and 1960, and Respondent Schwimer, 1973 and 1959. Respondents' claim of naivete regarding the keeping of accounting records is disingenuous. They deliberately commingled these accounts so they could borrow clients' funds. This, too, was rejected by *Wilson, supra,* 81 *N.J.* at 458.

The Board finds that mitigating factors in this case do not override the mandate of *Wilson, supra.* Therefore, the Board recommends Respondents be disbarred.

Before us, respondents have pressed the argument that they did not intentionally misappropriate their clients' trust funds. Our examination of the record, however, leads to the inescapable conclusion that the argument must fail and that respondents' intentional misappropriation has been established by clear and convincing evidence.

Respondents formed their law firm in 1979 and struggled with a marginal law practice into the summer of 1981, when they terminated the employment of their bookkeeper. Left to their own devices, they ceased using their operating account, which was subject to a levy by a judgment creditor, and began to use their trust account as the sole firm bank account. The testimony of respondent Fleischer makes painfully clear that respondents knowingly commingled the operating and trust accounts to meet firm expenses, and on several occasions they wrote checks that were returned for insufficient funds. The following exchange between Mr. Deakin of the Ethics Committee, respondent Fleischer, and Mr. Walder, counsel for respondents, is illuminating:

Q. Well, isn't it true to the extent you were making disbursements out of the trust account that you were using clients' funds?

A I would have to concede that that's true and it may sound a little bit unusual and it's no excuse but we were so naive we didn't appreciate what we were doing.

Q. Well, Mr. Fleischer, it has been stipulated from time to time there were, in fact, shortages even in the trust account, that is correct, isn't it?

A Yes.

Q. So that it follows as night follows day that if the trust account were overdrawn from time to time which it was, that you were using clients' funds to pay your own expenses, there's no question about that, is there?

A That's true, but we were depositing everything and anything that came into the office into that account in order to try to make sure all our obligations were met.

MR. WALDER: In fairness I think your question is presuming the use of a trust account, funds meaning it was trust funds when it really is trust account funds, not necessarily trust funds because everything going into it was under the heading of trust account, that's where I think your question may be, you know, respectfully, wrong in terms of the facts of the case.

*    *    *    *    *    *    *    *

Q. At least to the extent there were bounced checks, on those occasions you obviously must have been aware that you did not have sufficient firm funds in the trust account, isn't that correct?

A. Yes.

Q. No question about that, is there?

A. No, there's no question.

Q. That would answer Mr. Walder's observation. I assume that if a check bounced you certainly must have said to yourself or should have said to yourself we must not have enough of our own funds in this account because we're bouncing checks. Isn't that correct?

A Yes, that's a logical conclusion, that's correct.

Although respondents seek to justify their misappropriations on the grounds of naivete, respondent Fleischer's testimony in response to interrogation by Mr. Kenny of the Ethics Committee, as supplemented by testimony of respondent Shultz, shows unmistakable awareness that respondents knew they were doing something wrong.

Q. You knew you were all using clients' funds on occasions, did you not?

A We knew we were doing something we were not supposed to do and the problem was we kept depositing everything in that account, we weren't sure on each and every occasion whether they were invading funds or not. We knew we were not supposed to be using the trust account for operating expenses.

Q You knew you were short, you knew you needed the clients' money to survive, did you not?

A I would say so, yes.

Q. Okay. Why did you do it, I would like all of you to answer that.

MR. SCHULTZ [sic]: First of all, stupidity. But beyond that, there was this commingling but there wasn't an intentional misappropriation because I remember distinctly Mr. Fleischer almost every Friday calling the bank and speaking to the manager and saying, 'Do we have—you know, what is the balance?' And never really making out a check when there weren't funds in

there. We believed, and I know I did and Mr. Fleischer did, I know, because when we were talking about meetings, we used to say, 'We've got to stop it, we've got to get money together,' bookkeeper, we'd say the money in there is, you know, we deposited it there and while it was wrong and stupid, we didn't believe we were taking anybody's funds. I'm positive that we didn't. We knew what we were doing was commingling because we had our money in there and we were putting it in there for a long period of time.

When our bookkeeper left, things were so bad that we couldn't hire another bookkeeper. What we could have done and what we should have done is go to our parents or something like that for a loan which we didn't do at that time.

MR. KENNY: But you knew and you all admit you had a cash flow problem, you all admit that?

MR. SCHULTZ: Absolutely.

MR. KENNY: You made a conscious decision at some point in time to put your money, what were due you for fees and ultimately due you through negligence settlement or real estate closings or whatever all into one account and operate your business out of that account?

MR. SCHULTZ: That we did.

Further testimony by Fleischer, in response to questions by Ethics Committee member Venino, makes clear that respondents used their trust funds to survive.

Q. Was there ever a firm meeting called by you or any one of you [*sic*] other two partners when one of these trust account checks bounced for which you had paid out trust monies and you or someone else would say look, we have been using the trust account for just everything and now a check we have written for trust purposes has bounced, let's do something about this?

A. We met at that time, yes.

Q. And what was the result of the meeting, business as usual?

A. Well, to be perfectly frank with you, we continued the practice and I know there is no excuse but it probably was a matter of self-preservation.

Q. In other words, if you didn't use the monies that were in the trust account, you wouldn't survive, if you did you might survive, is that what you're saying?

A. Well, you could make that conclusion, Mr. Venino, yes.

\*      \*      \*      \*      \*      \*      \*      \*

MR. VENINO: Why did you choose to go into this venture of using the trust account? Because you didn't have money in your regular account?

MR. FLEISCHER: It was an easy way of doing things.

In light of that testimony, respondents' contention that they did not intentionally misappropriate clients' funds is unbelievable. Equally incredible is their assertion that their ignorance of proper accounting and banking practices was at the root of the

problem. In support of their contention, respondents point to their practice of calling their bank before making disbursements to ascertain if there were sufficient funds. Their argument is that because the bank balance did not reflect outstanding checks, their overdrafts resulted not from intentional misappropriations, but from inadvertence. As further proof of their alleged innocence, respondents point to instances when they declined to withdraw funds from the account because they did not want to invade clients' funds for their own benefit.

The DRB rejected that argument, stating that poor accounting procedures are no excuse for using clients' funds. We agree. We are not confronted here with an isolated or even an occasional bookkeeping mistake. Respondents admitted to a conscious joint decision to stop using their operating account and start using their trust account to pay all disbursements, including operating expenses. It is no defense for lawyers to design an accounting system that prevents them from knowing whether they are using clients' trust funds. Lawyers have a duty to assure that their accounting practices are sufficient to prevent misappropriation of trust funds. Former Disciplinary Rule 9–102, which was in effect at the time of respondents' misappropriations, mandated the deposit of trust funds in a separate account, prohibited commingling of those funds with other funds, and required the maintenance of appropriate records. The same requirements have been carried forward into Rule of Professional Conduct 1.15.

Our dissenting colleague states that the evidence does not sustain the finding that funds of any clients were ever knowingly invaded. The dissent continues by asserting that the proof of respondents' misappropriation would be less persuasive if respondents had not admitted their defalcation. It also questions the reasonableness of inferring misappropriation of client funds because the combined trust and operating account was overdrawn at various times when trust funds should have been on deposit in that account. Hypothesizing that the

overdrafts might have been attributable to bank error or an Internal Revenue Service lien, the dissent urges a remand for the development of a more complete record. We disagree.

The proof of the use of clients' funds is inescapable. Perhaps the case against respondents would be weaker if they had not admitted their wrongdoing, but the fact is that the defendants made the admissions. When a respondent, such as Mr. Fleischer, admits that a bounced trust account check demonstrates his awareness that he "did not have sufficient firm funds in the trust account * * *," we cannot ignore that admission. No member of the public could possibly have confidence in a disciplinary system that was blind to admitted misappropriations.

Apart from respondents' concessions, the record conclusively demonstrates their use of specific clients' trust funds. In three separate instances, respondents overdrew the account that contained the trust funds. On December 13, 1982, in the Samaro to Baldasare (Samaro) matter, the firm deposited $2,000 of trust funds into its combined account. During the remainder of that month and January 1983, the firm's account had an overdraft or a negative balance on 20 separate days.

In the Ocana to Abbott Laboratory (Ocana) transaction, the firm deposited $23,300 of trust funds for this client to its checking account. Subsequently, the firm issued a check to Ocana for $22,795, but it was returned for insufficient funds because the firm's bank account had been overdrawn to the extent of $4,885.55. When this check was redeposited, it bounced for a second time because the trust account was overdrawn to the extent of $9,451.08. The check did not clear until $10,000 of trust funds relating to another of the firm's clients was deposited into the joint trust account.

On a third occasion, involving the account of Mario Lima and Maria Aurelio Lima (Lima), another check failed to clear. Based on deposits and expenditures relating to the Limas' account, there should have been $6,956.38 in the account when

the respondents issued a check for $1,335 to the Limas. Once again, the check was returned unpaid because the account had an overdraft balance of $490.45.

The accountant retained by the Office of Attorney Ethics explained the self-evident proposition that "[i]f trust funds are supposed to be on hand as represented by the firm * * * then the bank account should never be overdrawn as long as those funds are supposed to be in possession of the firm regardless of co-mingling of funds." As the accountant concluded, it was "reasonable to infer that the overdraft balances indicate that the non-trust disbursements violated trust funds at least to the extent of the represented balances such as in the matters of Samaro, Ocana, and Lima." In the absence of any explanation by respondents, the overdrafts of the trust account establish misappropriation of those clients' funds.

Even respondents' own accountant, Mr. Ontell, acknowledged to the accountant retained by the OAE that "the facts of the Samaro and Ocana transactions indicated a violation of trust funds." Although Mr. Ontell later filed affidavits in support of a request for a remand, he never withdrew from his acknowledgement that the Samaro and Ocana transactions established that respondents misappropriated clients' funds.

Although respondents' accountant suggested the need for further analysis, we believe such analysis is unnecessary. With full knowledge that they should have maintained a trust account, respondents fired their bookkeeper and combined their trust and operating accounts so that they could use the trust funds for personal use and operating expenses. As the disbursements for December 1982 demonstrate, defendants used the combined account to pay personal expenses for themselves and their spouses, to pay themselves a draw, and to pay office expenses. In sum, respondents deliberately designed a system that would permit them to use trust funds for personal and professional use. Their need to use the trust funds arose because the income from their practice was insufficient to pay

expenses and to support themselves. At a firm meeting, they acknowledged that they were paying personal expenses from the combined account, but continued the practice as a matter of self-preservation. As a result, the dissent's assertion that the respondents were unaware until the present that they were using trust funds simply cannot stand. If the Court were to adopt the view of the dissent, respondents' conduct would constitute a handbook for larceny by lawyers.

The dissent also asserts that the respondents are entitled to differentiated treatment, presumably on the premise that one or more of the respondents was less culpable than the others. We agree with the principle that alleged violations of the Rules of Professional Conduct should be determined individually, not collectively. Here, the evidence clearly and convincingly establishes violations by each of the respondents. The initial decision to combine the accounts was a joint decision of respondents, who thereafter regularly discussed the status of the account. Each of the respondents decided that the combined accounts should be used to pay for their firm and personal expenses. Although they knew that the practice was improper, each defendant individually decided to continue it because the firm had insufficient funds to stay afloat. Throughout the entire proceedings, respondents have been represented by the same counsel, and they have not sought to distinguish among themselves in terms of responsibility for their defalcation. In this context, we are unable to find that any of the defendants should be excused. All are culpable.

Finally, respondents point to *In re Fucetola*, 101 *N.J.* 5 (1985), and *In re Hennessy*, 93 *N.J.* 358 (1983), to support their argument that disbarment is excessive. Unlike the present case, those matters involved charges only of improper record keeping, not of misappropriation. The evidence in *Fucetola* established that respondent failed to maintain proper trust records; it did not demonstrate that defendant misappropriated funds. 101 *N.J.* at 8–9. Consequently, we adopted the recom-

mendation of the DRB for a public reprimand. In *Hennessy*, the respondent did not maintain a ledger book and his use of trust funds to pay personal expenses resulted in "relatively minor shortages" that were not attributable to any particular client. 93 *N.J.* at 360. Consistent with the absence of any charge of misappropriation against the respondent, we decided that it was "unquestionably clear that he never intended to misappropriate funds." *Id.* Consequently, we held that a public reprimand was sufficient.

Unlike the *Hennessy* and *Fucetola* cases, the matter before us involves more than just record keeping violations. Here, the three respondents combined their operating and trust funds for the express purpose of paying personal and office expenses. Furthermore, the overdraft balances in their trust account are attributable to an invasion of specific clients' funds. In short, this is a case of intentional misappropriation.

Under *Wilson*, such a misuse of trust funds is not defensible on the ground that no client suffered a loss. 81 *N.J.* at 457–59. Also irrelevant is the fact that respondents' prior records are unblemished, *Id.* at 459–60; that subsequent misappropriations are unlikely, *Id.* at 460 n. 4; and that respondents are currently complying with the requirements for the maintenance of proper records, *Id.* at 459. The only appropriate sanction is disbarment.

Respondents are ordered to reimburse the Ethics Financial Committee for appropriate administrative costs.

Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI and STEIN join in this opinion.

Justice O'HERN has filed separate dissenting opinion.

O'HERN, Justice, dissenting.

I cannot concur in disbarment on the record before us. One or more members of the firm may eventually be found guilty of

a *Wilson* violation but the unique procedural posture of this case calls for further factual findings before I would vote to disbar.

Under *In re Wilson*, 81 *N.J.* 451 (1979), a knowing misappropriation ordinarily will warrant disbarment. "[M]aintenance of public confidence in this Court and in the bar as a whole requires the strictest discipline in misappropriation cases. That confidence is so important that mitigating factors will rarely override the requirement of disbarment." *Id.* at 461. A *Wilson* violation almost invariably results in disbarment; thus, such a case will ordinarily engage our closest attention because the consequences for a lawyer are so final. Lawyers are entitled to no less fundamental procedural fairness than others facing disciplinary sanction. *In re Ruffalo*, 390 *U.S.* 544, 550, 88 *S.Ct.* 1222, 1225, 20 *L.Ed.*2d 117, 122 (1968). I find the procedures in this case lacking and would therefore not vote to disbar.

First, in the interests of cooperation, the respondents entered into a stipulation with the presenter at the District Ethics Committee level. No evidence was presented that funds of any client were ever knowingly invaded. The case against respondents consists of inferences drawn from their perhaps too contrite and perhaps too belated recognition that the intermingling of clients' funds with their own would almost inevitably result in some clients' funds being used for the firm's business purposes. Nonetheless, the respondents seemingly prepared for this case as if it were not a misappropriation case but rather a record-keeping case. At the opening of the hearing before the District Ethics Committee, a discussion took place concerning one phrase in Count Five of the Stipulation of Facts that stated that "[a]ny record keeping or bookkeeping discrepancies which may have existed were due to inadvertence and lack of bookkeeping skill. All records were maintained and accounted for." It has been suggested that deletion of this phrase from the stipulation should have alerted respondents to the fact that at the hearing they would be charged with knowing misappro-

priation. The discussion of the deletion, however, concerned the fact that respondents recognized that during this period of time, their trust account, as well as their business and operating accounts, were handled under one account. Respondents were well aware of this fact. Conversely, it is not clear that they were aware of any knowing misappropriation.

The case proceeded then solely on the basis of the complaint and the revised stipulation. Had the respondents chosen not to present any evidence to the Committee, it is quite inconceivable that one could have found them guilty of any knowing misappropriation. Nicholas D'Apolito, an accountant retained by the Office of Attorney Ethics, analyzed the reconciliation of the respondents' books by David T. Ontell, a Certified Public Accountant. In his affidavit, D'Apolito concluded that "based upon the follow-up work I have performed, I have not received from either Mr. Ontell or the firm any evidence to the contrary in dispute of the facts as stated in my affidavit of March 21, 1983 or this affidavit which would alter my conclusion that H. Barry Shultz, Esq., Edward L. Fleischer, Esq., and Jay Lawrence Schwimer, Esq. of the firm Shultz, Fleischer, & Schwimer have not maintained appropriate books and records to account for clients' funds as required by *R.* 1:21–6(b)(2) and this constitutes a violation of DR 9–102(A)(1) and (2), DR 9–102(B)(4) and DR 9–102(C)." Notably missing from the affidavit is any statement that definitely concludes that the individuals knowingly misappropriated any clients' funds at a particular time. D'Apolito had concluded in his previous affidavit that "[i]n absence of evidence to the contrary, it is reasonable to infer from the transactions noted above that the checks drawn * * * against the trust account * * * represent an invasion of * * * [some] * * * client's or [other] clients' trust funds."

Secondly, apparently believing themselves not in mortal danger, respondents did not undertake to weigh their individual responsibility. They gave informed consent to a common defense to these charges. Nonetheless, it is clear from our cases that we evaluate professional responsibility not on a collective

basis but on an individual basis grading the responsibility of each of the individuals. *See, e.g., In re Shamy,* 59 *N.J.* 321, 326 (1971). There are sharp differences in responsibility among the individuals involved here and I simply find it unfair now, after stipulations have been entered, to join them all together.

Finally, we must ourselves be clearly convinced that there was, in fact, an intentional invasion or knowing misappropriation of clients' funds. *In re Sears,* 71 *N.J.* 175, 197 (1976).

> This high standard emphasizes the reluctance which should characterize a decision to impose a disciplinary sanction and the serious consequences which attend such a decision. As a practical matter, such a decision limits, if it does not preclude, an attorney's opportunity to practice his chosen profession. We should impose such a restriction only after careful deliberation and only in circumstances which clearly warrant it. [*Id.* at 197–98.]

We must look carefully, then, at the complaint of professional misconduct that was filed against these individuals. The first count of the complaint charged that the respondents commingled funds for approximately two years, in violation of Rule 1:21–6(a) and Disciplinary Rule 9–102(A). This continuation of unethical conduct was alleged to constitute gross negligence in the handling of clients' funds and to reflect adversely on the respondents' fitness to practice law. So much they have admitted.

The second count charged them with failing to balance or close out many client trust accounts. Client ledger sheets were set out reflecting six undisbursed credit balances. The absence of ledger sheets, required by the Rule, was specified in twelve instances. Allegedly, eleven checks were shown in the account where a client ledger sheet existed but did not reflect the transaction. Respondents were charged with failure to maintain journals of receipts and disbursements and to reconcile their accounts. Each and every one of these matters was specifically addressed and the accounts were reconciled in the stipulation. The parties concede that the records were inadequate.

The third count concerned seven specific instances of overdrafts made on the trust account. Each instance was dealt

with in the stipulation and all of the clients' funds were accounted for. The complaint stated that the trust account items that were returned represented "conclusive evidence of a prior invasion of a client's funds constituting misappropriation" and otherwise reflected adversely upon respondent's fitness to practice law. This evidence was concededly relevant to fitness to practice law, but I cannot conclude that a bounced check represents conclusive evidence of a prior invasion of a client's funds constituting misappropriation. We know that on many occasions, even through error, the Internal Revenue Service or others will seize an attorney's trust account funds, causing an unintentional return of a check. Banks frequently do not credit accounts with deposited funds for extended periods of time even though the funds are on hand. We could never conclude that, standing alone, a bounced check would constitute misappropriation.

The fourth count alleges a series of account transactions, commencing in December 1981, that disclosed negative trust account balances. The count concluded that these "extensive and prolonged trust account shortages * * * reflect a dereliction of the fiduciary requirements of R. 1:21–6 and DR 9–102, and are evidence of misappropriation and misapplication of client funds in violation of DR 1–102(A)(4) and (6)." Respondents' accountant found certain instances of negative balances but concluded that it did not demonstrate misappropriation:

> Because Respondents did not balance the trust account, and, further, because Respondents relied upon bank balance information provided to them by telephone by the bookkeeping department of their bank, the effect of uncleared checks and undebited disbursements was not accurately considered. This lack of an orderly procedure, together with Respondents' use of primarily only the one account, caused Respondents to rely on dated and inaccurate information as to the account balance on any given business day.

The fifth count incorporates the allegations of the first four counts and concludes that "[t]hese failures of accountability led to their natural result in Respondents' operation of a 'revolving' trust account wherein each new trust deposit was invaded as necessary to accommodate both office and personal expendi-

tures and disbursements on behalf of previously invaded trust deposits." The respondents conceded that they had an account in which trust and business funds were commingled, but they did not admit that they knowingly invaded clients' funds.

Notwithstanding the fact that more than 22 specific items are mentioned in the several counts of the complaint, this Court makes no finding that the funds of any particular client were ever *knowingly* invaded on any specific occasion. The Court points to three specific matters (Samaro, Ocana and Lima) that are said to demonstrate an intent to invade clients' funds. But the majority's disposition does not turn upon an analysis of which partner drew on the funds or what that partner knew. Thus, I must examine the record for evidence of a knowing misappropriation of clients' funds.

The detailed analysis submitted on behalf of the respondents explains that conclusions with respect to the invasion of trust funds based upon either bank statements or returned items are simply improper from an accounting viewpoint. Even as to the critical month of December 1982, when the Samaro incident occurred, respondents' accountant states that the "firm deposits in the trust account were $6,379.47 in excess of the $17,-716.68 referred to * * * as non-trust disbursements [in the OAE's account]."[1] Respondents have never conceded that they misappropriated these funds. The affidavit that Mr. Fleischer filed with the District Ethics Committee stated:

> Although we concede our dereliction with respect to the commingling of the funds, to my knowledge no client was shorted funds and there was never an intent or belief on our part that client funds in our trust account were used or that any loss or prejudice has occurred to any of our clients. I believe that a complete audit will show that we did not misappropriate any client's trust funds. This, of course, does not lessen our responsibility with respect to the

[1] Our Advisory Committee on Professional Ethics has provided that firms may draw against other clients' collected funds when mortgage and certified checks are presented at a real estate closing. *Advisory Opinion 454,* 105 *N.J.L.J.* 441 (May 15, 1980).

commingling of the funds or the sloppy record keeping practices referred to above.

In addition, the record disclosed that respondents refrained from any draws on the account when they believed clients' funds would be involved. We recently noted in another case that questioning at oral argument "revealed that the OAE's position was not that knowing misappropriation had been established, but rather that respondent's negligence in handling money was sufficiently gross to warrant disbarment even [though] he did not *know* it was client's money. That is *not* the rule of *Wilson*." *In re Noonan*, 102 *N.J.* 157, 160–61 (1986) (emphasis in original).

The majority takes note of the respondents' testimony at the committee hearing, concluding therefrom that respondents knowingly misappropriated funds. *Ante* at 444–447. This conclusion is based on respondents' testimony that they realized, at the time of the hearing, they had used clients' funds since checks had been returned for insufficient funds. The danger in such reasoning is that when lawyers are not contrite, they are criticized for not acknowledging their faults; when they acknowledge their faults, they are held to have confessed. Moreover, the statements are inconclusive, since they do not reflect the fact, which respondents clarified in further testimony, that they were discussing their present understanding. Respondents testified that they never intended to use clients' funds and always believed there were sufficient funds on hand.

Charging these respondents with misappropriation of funds is akin to charging them with a crime. We would be hard-pressed to sustain criminal convictions against such disparately situated individuals based on the evidence that we have before us. The District Ethics Committee was not unaware of this problem and candidly acknowledged it: although finding it "inconceivable to this panel that respondents did not know that they were invading the funds of clients * * * [and] * * * using the funds of clients' funds for their own benefit," the Committee prefaced these comments by noting that "[i]t is the feeling of this

hearing panel that a complete audit should be done in this matter to resolve any doubt that the Disciplinary Review Board may have."

Were these allegations presented against an individual, it might be appropriate to sustain a disbarment on a principle of gross neglect. *See, e.g., In re Katz,* 90 *N.J.* 272 (1982). But where we deal with such differentiated scope of responsibility, I think it is unfair to proceed on the theory of group ethical responsibility. Ontell, the accountant retained by the respondents specifically to examine the exhibits submitted to the District Ethics Committee and the affidavit of the auditor for the Office of Attorney Ethics, analyzed all of the documents and concluded that "[i]t cannot be stated that there has been an invasion and misappropriation of clients trust funds in the absence of a complete examination and audit by me and solely on the facts and analysis set forth in the Affidavit of Mr. D'Apolito." It was in response to this affidavit that Mr. D'Apolito, the OAE's auditor, stated that he would conclude only that respondents had not maintained appropriate books and records to account for clients' funds. D'Apolito did not state that he found an invasion of clients' trust funds. He did later qualify his affidavit to state, for example, that "[t]he facts stated in my [original] affidavit of March 21, 1983 relative to Samaro, Ocana and Lima would indicate that at the least [funds of] clients were put in jeopardy."

I realize that it is very difficult to sort out the specifics of the charges as to each individual client's account. However, that responsibility is inescapable, especially where, as here, we seek to impose collective responsibility on the firm.

Because of the complexity of this matter, I would remand it to a Special Master to determine whether individual client's funds were invaded, whether such invasion was a knowing invasion by the attorneys responsible, and the state of knowledge of each of the individuals involved.

*For disbarment*—Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, GARIBALDI and STEIN —6.

*Opposed*—Justice O'HERN—1.

## ORDER

It is ORDERED that EDWARD L. FLEISCHER of MORGANVILLE, who was admitted to the bar of this State in 1969, be disbarred, and it is further

ORDERED that EDWARD L. FLEISCHER reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that EDWARD L. FLEISCHER be permanently restrained and enjoined from practicing law; and it is further

ORDERED that EDWARD L. FLEISCHER comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with suspended, disbarred or resigned attorneys.

## ORDER

It is ORDERED that H. BARRY SHULTZ of MORGANVILLE, who was admitted to the bar of this State in 1966, be disbarred, and it is further

ORDERED that H. BARRY SHULTZ reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that H. BARRY SHULTZ be permanently restrained and enjoined from practicing law; and it is further

ORDERED that H. BARRY SHULTZ comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with suspended, disbarred or resigned attorneys.

## ORDER

It is ORDERED that JAY L. SCHWIMER, of MANALA-PAN, formerly of MORGANVILLE, who was admitted to the bar of this State in 1973, be disbarred, and it is further

ORDERED that JAY L. SCHWIMER reimburse the Ethics Financial Committee for appropriate administrative costs; and it is further

ORDERED that JAY L. SCHWIMER be permanently restrained and enjoined from practicing law; and it is further

ORDERED that JAY L. SCHWIMER comply with Administrative Guideline Number 23 of the Office of Attorney Ethics dealing with suspended, disbarred or resigned attorneys.